Louis P. RIVER, III, Plaintiff–Appellant,

v.

COMMERCIAL LIFE INSURANCE COMPANY, Defendant–Appellee.

No. 97–3581.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1998.

Decided Nov. 23, 1998.

---

Robert R. Tepper (argued), Chicago, IL,
for Plaintiff–Appellant.

Mary P. Benz (argued), Catherine J. Casey, Quinlan & Crisham, Chicago, IL, for Defendant–Appellee.

Before COFFEY, KANNE and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

In 1980, the plaintiff-appellant, Louis P. River ("River"), a surgeon licensed and practicing in the state of Illinois, was diagnosed with a manic depressive psychiatric problem. River continued to carry out his duties as a surgeon until 1985, when he was forced to terminate his surgical practice due to his psychiatric problem. In 1986, River's insurer, Commercial Life Insurance Company ("Commercial"), the defendant-appellee, began providing River with "sickness" disability benefits amounting to $1,800 per month.

After having exhausted his "sickness" benefits in late 1992, River filed suit against Commercial on July 2, 1996, seeking declaratory judgment alleging that his psychiatric illness, which allegedly stemmed from an accident that occurred in 1980, should be covered as an "injury" under the language of the policy, thereby obligating the defendant to pay disability benefits to the plaintiff for the remainder of his life. The defendant insurance company filed a motion for summary judgment on July 31, 1997, arguing that the plaintiff's manic depressive illness was not the result of the alleged accident of 1980, but was more properly classified as a "sickness," for which insurance benefits had previously been paid. The United States District Court for the Northern District of Illinois granted the defendant's (Commercial's) motion for summary judgment, ruling that the plaintiff had failed to satisfy conditions precedent to receiving "injury" benefits under the terms of the insurance policy. We affirm.

## BACKGROUND

River alleges that on August 2, 1980, he bumped his head on a metal doorframe while demonstrating ballet maneuvers for his son in his home in Chicago, Illinois. Although the plaintiff allegedly lost consciousness for several minutes, the record reflects that it never was considered serious enough for him to seek medical attention for the alleged injury to his head, and that he instead ingested two Tylenol tablets and slept through the night. River returned to the operating room the following day and carried out his surgical duties at Oak Park Hospital in Oak Park, Illinois.

On September 15, 1980, the plaintiff began to exhibit severe manic psychiatric symptoms[1] necessitating hospitalization in Mercyville Hospital's psychiatric ward in Aurora, Illinois. Shortly thereafter, on October 3, 1980, Dr. Lee Gladstone ("Gladstone"), a psychiatrist at Northwestern University Memorial Hospital, examined River and directed that he be transferred from Mercyville to the psychiatric ward at Northwestern. Gladstone noted in his history that River informed him that for the past fifteen years, River had consumed between ten and twenty-five ounces of alcohol each evening to help him sleep. River also told Gladstone that he had also ingested one or two Meprobamates, an oral sedative used for the relief of anxiety and tension, each evening for the past ten years. Gladstone also noted in River's medical record that in his opinion, River had abused alcohol for years prior to his hospitalization in order to self-medicate a pre-existing manic condition. Gladstone also noted that prior to October of 1980, River had no history of past physical injuries that one could identify as contributing to his illness. During this period of inpatient confinement, Gladstone officially diagnosed River as suffering from manic depression. River's condition subsequently improved and he returned to his surgical practice at Oak Park Hospital in February of 1981.

In June of 1985, River's psychiatric problems took a turn for the worse, severe enough to necessitate the termination of his surgical practice. Six months later, in January of 1986, he submitted a claim for disability benefits to one of his insurers, the

---

1. Dr. River first exhibited what his wife terms "euphoric" behavior on September 15, 1980, when he stayed awake all night reading the *Second Coming* by novelist Walker Percy. River telephoned Percy's agent to option or purchase the rights to the novel and later visited Percy's home in New Orleans on October 1 unannounced to try to negotiate for the film rights of the novel.

defendant Commercial. Commercial's policy provided for the payment of monthly benefits totaling $1,800 if the insured became disabled while the policy was in force. The policy distinguished between disability benefits for "sickness" and disability benefits for "injury." Specifically, the "sickness" provision provided benefits for "loss or disability commencing during any term of this Policy, resulting from sickness or disease" for a maximum of seven years. On the other hand, the "injury" provision of the policy provided lifelong benefits for "loss or disability, resulting directly and independently of all other causes *from accidental bodily injury* occurring during any term of this Policy." (Emphasis added). Written notice of a claim for benefits had to be filed within twenty days of a particular loss or disability, or as soon as reasonably possible. Furthermore, the coverage provision for "injury" benefits provided that the insurer was obligated to make monthly benefit payments only "for total disability which results from 'injury' and occurs *within one year from the date of the accident."* (Emphasis added). The policy defined "total disability" as a condition in which the insured was "wholly and continuously unable to perform all of the substantial and material duties of [the insured's] occupation." In order to qualify to receive either "sickness" or "injury " benefits, the insured needed to be totally disabled for *a minimum of six months.* River did not claim any "sickness" benefits during his hospitalization in 1980 because he returned to his duties as a surgeon *within five months* after the original onset of his psychotic episode. By contrast, River's 1985 episode caused him to stop working for a period of *more than six months*, and in January of 1986, River filed a claim for "sickness" benefits. Commercial approved River's application or "sickness" benefits, and began making monthly benefit payments of $1,800, which River exhausted seven years later, as dictated under the terms of the policy. During the seven-year span, commercial paid River total benefits in excess of $150,000.

Shortly after his benefits were exhausted, River had an accident while riding his bicycle in Florida. To avoid hitting a pedestrian, River was forced off a path, lost control of his bicycle, and was catapulted to the ground sustaining a head injury. His mental health deteriorated, necessitating hospitalization once again in 1993. According to River, at this time he and his wife began to speculate about a connection between the bicycle accident and the recurrence of River's psychiatric illness. River reviewed an old diary kept by his wife and realized that his initial hospitalization in 1980 came two months after the 1980 accident in his home in Chicago. River and Dr. Gladstone concluded in 1994 that there was a link between the 1980 head trauma and the onset of River's psychiatric episodes in 1980 and 1985.

In September of 1994, River retained an attorney to contact each of his disability insurers to assert claims under the "injury" provisions of his various policies. But River failed to contact Commercial until October 17, 1995, ten years after the full manifestation of his disorder, when he sent a letter requesting that Commercial reinstate his disability benefits for life. River specifically contended that his manic depressive illness should not be classified as a "sickness," but rather as an "injury" resulting from his doorway accident in 1980. The letter to Commercial was mailed more than a year after River had contacted his other disability insurers and approximately three years after his sickness benefits from Commercial had been exhausted. River now contends that the reason he was delayed one year in contacting Commercial after he had contacted his other disability insurers was because he had forgotten about the Commercial policy.

Commercial reviewed River's newly filed "injury" claim. Commercial hired an independent entity, Managed Health Benefits, to conduct an investigation of River's claim. The investigation included an independent analysis of the medical records submitted by River, and an interview with River's treating psychiatrist, Gladstone. During the interview, Gladstone stated that River was probably self-medicating his manic episodes with alcohol for many years prior to his first appointment with Gladstone in October of 1980, two months after he had allegedly hit his head on the doorway. Richard Ellman, R.N., M.P.S., the Disability Case Manager

with Managed Health Benefits, concluded that

> based on the review of the medical record *the claimant appears to have had the illness of alcoholism and probably manic-depressive illness prior to his alleged head injury*, which occurred on August 2, 1980. *It would appear that the manic-depressive illness the patient is suffering from is not a result of the head trauma.* There is [sic] no conclusive medical records showing any form of medically accepted, diagnostic testing which normally would have occurred, i.e. M.R.I., CT Scan. Further, *we recommend that the continued disability payments end as of the claimants* [sic] *65th birthday, as the contract reads for an illness Vs. the claimants [sic] claim that the "cause" of his manic-depressive illness is from two related "accidents."*

(Emphasis added). Based in part on Managed Health Benefits's investigation, Commercial denied River's "injury" claim on April 17, 1996, because he had failed to comply with the conditions precedent under the policy, in particular the clause that required that River report his "injury" claim within twenty days of the date of the onset of his disability.

River filed a complaint seeking declaratory judgment alleging that his disability resulted from the injury, thereby entitling him to benefits for life. Commercial moved for summary judgment, contending that River failed to satisfy the conditions of the policy. The district court entered summary judgment in favor of Commercial on September 24, 1997.

### ISSUES

On appeal, River contends that the trial court erred in granting the defendant's motion for summary judgment. Specifically, the plaintiff argues that the trial judge improperly ruled that River had failed to satisfy conditions precedent under the policy in that: (1) River did not provide a written notice of claim to Commercial for "injury" benefits within twenty days after the onset of his disability, which occurred in early 1986 when he had suspended his surgical duties for the requisite six months; (2) River's disabling manic-depressive injury, which forced

him to stop working in 1985, did not occur within one year of the doorway accident; and (3) River failed at any time to submit medical documentation of his injury to Commercial as required under the terms of the policy. River also argues that the language of his policy with Commercial, originally purchased in 1976, differs slightly from that of his current policy, which replaced the original policy in 1982. Specifically, River notes that the original policy did not contain a requirement that an insured's period of claimed disability must commence within a year of the accident. Both parties stipulated that the language of the 1982 policy would be guiding in the resolution of this claim. On appeal, River reverses his position and now contends that summary judgment was improper because the policy interpretation was based on language that "does not appear in what may have been the relevant [1976] policy."

### DISCUSSION

This Court reviews the trial court's grant of summary judgment *de novo. See Allen v. Transamerica Ins. Co.*, 115 F.3d 1305, 1309 (7th Cir.1997). The grant of "[s]ummary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Huntzinger v. Hastings Mut. Ins. Co.*, 143 F.3d 302, 306–07 (7th Cir.1998) (quoting Fed.R.Civ.P. 56(c)).

The parties do not dispute that Illinois law governs the interpretation of the insurance policy at issue. Furthermore, the trial court correctly applied Illinois law in reaching its conclusion.

> [A]n insurance policy is a written contract that memorializes an agreement or "meeting of the minds" between the insurer ... and the insured.... In exchange for the payment of premiums by [the insured], [the insurer] agreed to cover certain medical expenses of [the insured], subject to the terms and conditions of the contract....

*Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir.1996) (citation omit-

ted). Under Illinois law, the interpretation of an insurance policy, even an ambiguous policy, presents questions of law that are appropriately resolved by summary judgment. *See West Suburban Bank of Darien v. Badger Mut. Ins. Co.*, 141 F.3d 720, 723–24 (7th Cir.1998); *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). "A term is [only] ambiguous if it is subject to reasonable alternative interpretations." *Bechtold v. Physicians Health Plan of Northern Indiana, Inc.*, 19 F.3d 322, 325 (7th Cir.1994) (citation and internal quotation omitted). "Illinois courts apply the rule that any ambiguities in the provisions of an insurance policy will be construed against the drafter of the instrument, the insurer, and in favor of the insured." *Heller v. Equitable Life Assurance Soc'y of the U.S.*, 833 F.2d 1253, 1256 (7th Cir.1987) (citation omitted). An insurance policy that contains no ambiguity is construed according to the plain and ordinary meaning of its terms. *See National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir.1987); *Heller*, 833 F.2d at 1256 ("where ... there is no ambiguity, [the courts] will not ignore the very plain language of the policy.") (citation and internal quotation omitted). "In construing an insurance policy, the court must ascertain the intent of the parties to the contract by construing the policy as a whole while giving due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract." *Employers Ins. of Wausau v. James McHugh Const. Co.*, 144 F.3d 1097, 1104 (7th Cir.1998); *see also Colonial*, 690 N.E.2d at 669 ("In construing an insurance contract, we ultimately must give effect to the intent and reasonable expectations of the parties as expressed in the contract."). "An unambiguous provision in an insurance policy must be enforced, even if it results in a limitation of the insurer's liability. However, where the language of an insurance policy is ambiguous ... the court must construe the language in favor of the insured." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 151 (7th Cir.1994) (citations omitted). A court should not search for ambiguity where none exists. *See General Ins. Co. of America v. Robert B. McManus, Inc.*, 272 Ill.App.3d 510, 209 Ill. Dec. 107, 110, 650 N.E.2d 1080, 1083 (1995). Mere disagreement about the interpretation of an insurance contract does not render it ambiguous. *See Nat'l Wrecking Co. v. St. Paul Surplus Lines Ins. Co.*, 11 F.3d 685, 687 (7th Cir.1993) (citation omitted). Furthermore, "insurance policy [e]xceptions to liability must be expressed in unequivocal language so that it is reasonable to assume the insured understood and accepted these limitations." *Heller*, 833 F.2d at 1256 (citation and internal quotation omitted).

## A. The Policy's Conditions Precedent

River contends that he is entitled to lifelong "injury" benefits under his insurance policy with Commercial. River argues that the doorway accident in his home in 1980 caused him to become totally disabled and unable to engage in his profession of surgery and that he failed to notice the connection between the doorway accident and his psychosis until 1994, when he discussed the matter with his treating physician, Dr. Gladstone. Commercial argues that the plaintiff is not entitled to "injury" benefits because River failed to satisfy the conditions of the policy.

We will initially consider the policy's notice of claim requirement. In order to qualify for lifelong "injury" benefits, River's policy required, among other things, that "written notice of claim must be given within twenty days after a covered loss starts or as soon as reasonably possible." The policy further stipulates that the notice of claim "must include Your name and also, Policy number," and that the insurer will then send a proof of loss form to be completed by the insured after the notice of claim is received.

The Illinois Supreme Court has held that notice of claim provisions in insurance policies are valid prerequisites to coverage and not mere technical requirements. *See State Sec. Ins. Co. v. Burgos*, 145 Ill.2d 423, 164 Ill.Dec. 631, 635, 583 N.E.2d 547, 551 (1991). Illinois courts have generally ruled that late notice to an insurer is a basis for denying coverage. In the case of *Charter Oak Fire Ins. Co. v. Snyder*, 22 Ill.App.3d 350, 317 N.E.2d 307 (1974), the plaintiff held an automobile insurance contract with the defendant. The insurance policy in question required that, "[i]n the event of an accident or loss, written notice ... be given by or for the

insured to the [insurer] or any of its authorized agents as soon as practicable...." *Id.*, 317 N.E.2d at 309. The plaintiff was involved in a car accident in November of 1968. *See id.* The plaintiff claimed that he was unaware of the existence of the defendant's policy until November of 1969. However, the plaintiff failed to notify the insurer of a pending claim for a period of four months after he learned of the existence of the policy. *See id.*, 317 N.E.2d at 310. The court rules that because the plaintiff failed to give notice of the claim until four months after he became aware of the policy's existence, the policy's coverage of the claim had terminated. *See id.*, 317 N.E.2d at 311. Similarly, in *Equity Gen. Ins. Co. v. Patis,* 119 Ill.App.3d 232, 456 N.E.2d 348 (1983), the court affirmed the trial court's grant of summary judgment for an insurer's denial of insurance benefits on the grounds that the insured's failure to give notice of claim within four and one-half months after the claim arose was unreasonable. *See also Illinois Valley Minerals Corp. v. Royal–Globe Ins. Co.,* 70 Ill. App.3d 296, 26 Ill.Dec. 629, 388 N.E.2d 253 (1979) (affirming summary judgment for insurer after a six month delay in notice). As one appellate court summarized, "[u]nder Illinois law, a delay of even a few months in giving notice breaches the policy as a matter of law, defeats coverage, and justifies the entry of summary judgment for the insurance company." *Industrial Coatings Group, Inc. v. American Motorists Ins. Co.,* 276 Ill.App.3d 799, 213 Ill.Dec. 317, 324, 658 N.E.2d 1338, 1345 (1995) (citations omitted).

█ However, if the insured has a justifiable and reasonable excuse for the delay in providing notice, even a lengthy passage of time is not an absolute bar to coverage. In *Sonoco Bldgs., Inc. v. Am. Home Assurance Co.,* 877 F.2d 1350, 1356 (7th Cir.1989), this Court held that an insured's delay of twenty-one months in giving notice of claim to a common carrier's insurer was reasonable. The insured sued the common carrier and its insurer only after discovering that its goods had been delivered by the common carrier to the wrong address. We held that once the insured became aware of the location of the goods and the insurer's identity, it acted with reasonable diligence to file notice of its claim. *See id.* Illinois courts routinely consider

four factors in assessing the reasonableness of an insured's delay in providing notice of an insurance claim: "(1) the language of the policy's notice requirement; (2) the extent of the insured's sophistication in the world of commerce and insurance; (3) awareness on the part of the insured that an 'occurrence' has taken place; and (4) once aware of an occurrence, the diligence with which the insured ascertains whether coverage is available." *Ankus v. Gov't Employees Ins. Co.,* 285 Ill.App.3d 819, 221 Ill.Dec. 72, 77, 674 N.E.2d 865, 870 (1996) (citation omitted). In *Ankus,* a passenger in an automobile accident failed to provide notice of a possible claim to the defendant automobile insurer until ten years after the accident. *See id.,* 221 Ill.Dec. at 74, 674 N.E.2d at 867. For the first eight years of the ten-year delay, the claimant mistakenly pursued her claim with the wrong insurer. *See id.* at 77, 674 N.E.2d at 870. After she became aware of the identity of the proper insurer, the claimant failed to notify that insurer of the claim for another two years. *See id.* The court ruled that even though the claimant lacked knowledge in insurance matters, the language of the policy required that all claimants contact their insurer as soon as possible after an accident, and the claimant here failed to act with diligence in providing notice to the proper insurer. *See id. The court denied the passenger coverage under the insurance policy.*

█ In the case under consideration, River maintains that his accident in 1980 caused a disabling injury that forced him to discontinue the performance of his duties as a surgeon in 1985. His claim for "injury" benefits, however, was not submitted to Commercial until October of 1995, some fifteen years after the date of the alleged incident, and some ten years after the insured became totally disabled. River contends that the delay in filing his notice of claim was reasonable as he did not suspect a connection between the trauma to his head in 1980 and his illness until he received confirmation of the possibility of such a link from his treating psychiatrist, Dr. Gladstone, in September of 1994. River further claims that he failed to contact Commercial until 1995 because he

had allegedly "forgotten" that the Commercial policy existed.

River's ten-year delay in giving notice violated the express time limit of the insurance policy's notice of claim provision. The Commercial policy mandated that a notice of claim must be filed within twenty days after a covered loss starts or as soon as reasonably possible. River failed to even come close to meeting the twenty-day deadline. Under this Court's rule in *Sonoco*, 877 F.2d at 1356, such a violation of the express notice provisions of an insurance policy renders a claim under the policy invalid, unless the violation is deemed reasonable, and River argues that since he did not suspect a connection between the head trauma and his illness until 1994, his delay was reasonable.

To determine the reasonableness of River's delay, we consider the four-part test in *Ankus*, 221 Ill.Dec. at 77, 674 N.E.2d at 870. Under the first criterion of the *Ankus* test, River's reporting lapse clearly violated the express terms of the notice provision in the insurance policy. For a claim to be proper, the policy provided a maximum of twenty days between the onset of disability and the notice, and River exceeded this twenty-day limit. Concerning the test's second requirement, River's contention that he is not sophisticated in insurance matters is not tenable as he had contracted with a number of insurance companies in the past, held a number of different disability policies, and sought professional assistance from his attorney in giving notice to his disability insurers of his "injury" claim. In *Hartford Cas. Ins. Co. v. Snyders*, 153 Ill.App.3d 1040, 106 Ill.Dec. 827, 506 N.E.2d 627 (1987), the court held that a doctor who failed to inform his insurer about a pending suit until seven months after the suit was filed was not excused from giving notice because he was "unsophisticated." In so ruling, the court pointed out that the insured doctor, similar to River, had prior experience in dealing with insurance companies and filing malpractice claims during more than twenty years in the medical field. *See id.*, at 829, 506 N.E.2d at 629. Concerning the third criteria in *Ankus,* River became totally disabled in 1985, and qualified for insurance benefits in early 1986. He now contends that he and Dr. Gladstone did not become aware until 1994 that his accident in 1980 may have led to his disability and that he might be entitled to lifetime "injury" benefits. He nonetheless failed to act on his awareness of the connection between the accident and his disability for one full year until he contacted Commercial in 1995. As discussed earlier, in *Patis*, 74 Ill.Dec. at 850, 456 N.E.2d at 352, the court ruled that the claimant's four and one-half month delay in filing a claim for insurance benefits was not reasonable—River's one year delay is likewise not reasonable. Finally, concerning the fourth criteria in *Ankus*, the fact that River had received seven years of disability benefits from Commercial prior to his request for "injury" benefits in 1995 belies his contention that it was reasonable for him to forget about the policy. Under Illinois law, River's convenient memory lapse cannot be considered a justifiable excuse for the lengthy delay in filing the notice of claim. *See May v. National Life Ins. Co.*, No. 96 C 616, 1997 WL 461085 (N.D.Ill. Aug.8, 1997) (summary judgment granted for insurer on disability policy where six-month delay in giving notice did not comply with policy terms; insured's claimed ignorance of the policy did not excuse failure to give required notice); *Ankus*, 221 Ill.Dec. at 77, 674 N.E.2d at 870 (summary judgment granted for defendant insurer where plaintiff insured claimed she did not know that coverage existed). Thus, under the four-part *Ankus* test, River's delay in giving Commercial notice of his "injury" claim cannot be considered reasonable.

■ In the alternative, River argues that the claim he submitted for "sickness" benefits in 1986 satisfies the notice requirement for his claim for "injury" benefits. River contends that the notice provision requires only that a claim include the insured's name and his policy number, and that the identification of the disability as an "injury" or a "sickness" on the proof of loss form is not part of the notice requirement.

■ The district court ruled that proper notice requires the disclosure of the cause or source of the claimant's disability. The purpose of the notice provision is to allow insurers to investigate the claim while it is fresh and before witnesses and the respective parties move away or their recollections fail.

Reading the contract in its entirety, as required by the rules of construction, *see McManus*, 209 Ill.Dec. 107, 650 N.E.2d at 1083, the policy's language is very clear and unambiguous and requires a description of the nature of the claim as part of the notice provision. The notification process does not end with the filing of the insured's name and policy number, but rather includes the additional step of requiring the insured to describe whether his condition is a "sickness" or "injury" on the proof of loss form and allowing the insurer to properly determine whether the award of "injury" benefits is warranted where requested by the insured. Because River's claim for "sickness" benefits in 1986 did not include any information that would cause a reasonable person to conclude that his 1985 manic episode should be classified as an "injury," River's claim for "sickness" benefits in 1986 failed to give any type of notice to Commercial of a claim for "injury" benefits.

In summary, as pointed out earlier, one of the primary requirements of the Commercial policy is that notice for "injury" benefits must be provided to the insurer within twenty days of the date of disability, obviously to give the insurance company an opportunity, according to the terms of the contract, to conduct a proper and timely investigation of the merits of the claim. River's 1995 notice for "injury" benefits did not occur within twenty days of the date of his total disability in 1986. River's delay in notifying Commercial was not reasonable, even in light of the fact that River allegedly did not conclude that his disability was somehow related to his doorway accident until 1994. Because River failed to satisfy the notification requirement of his policy, we agree with the trial court's finding that River was ineligible for "injury" benefits. We therefore need not consider the merits of River's arguments concerning the other two conditions of the policy: that the injury occur within one year of the accident and that the insured provide written proof of his injury.

### B. Policy Construction

The plaintiff also contends that the language of his original policy with Commercial, purchased in 1976, differs slightly from that of his current policy, which replaced the original in 1982. Specifically, River notes that the original policy did not contain a requirement that in order to receive "injury" benefits, the insured's total disability (the insured is "wholly and continuously unable to perform all of the substantial and material duties of [the insured's] occupation") must occur within one year of the date of the injury-causing accident. Both parties, however, signed a stipulation which provided:

> It is hereby stipulated and agreed, by and between the parties hereto, acting by and through their respective counsel, that the policy at issue in this case was a replacement for a prior policy and that, with respect to the language of the policy, the present policy shall be deemed to have been continuously in effect since prior to 1980.

Thus, the parties agreed that the language of the 1982 policy would be guiding in the resolution of this claim. River now reverses his position and contends that summary judgment was improper because the policy interpretation was based on language that "does not appear in what may have been the relevant [1976] policy." River argues that "the parties did not stipulate that the present policy would be the one governing this claim, only that, with respect to the language of that policy, it should be deemed to have been continuously in effect since prior to the year of the accident."

The plaintiff, in a desperate attempt to manufacture a question of fact, has crafted this argument as a basis for reversing the trial court's grant of summary judgment. In essence, the plaintiff contends that the 1976 policy, which he alleges he "found" late in discovery, should be the basis of the trial court's ruling, rather than the 1982 policy.

The plaintiff's reasoning is faulty for several reasons. Initially, we point out that because the plaintiff failed to raise this issue before the trial judge, he is barred from presenting it on appeal. *See Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 271 (7th Cir.1988). River argues that he did not have an "opportunity to meaningfully address" the prior policy issue at the district court level. At the same time, he admits that he discovered the policy even

before he filed his opposition to Commercial's motion for summary judgment. River therefore could have addressed this issue in his response brief to the defendant's summary judgment motion. However, he chose not to, and has therefore waived the argument on appeal.

Second, even if the plaintiff had not waived this argument by failing to raise it before the district court, his contention is erroneous because it is in conflict with the stipulation. In the clearest terms, River stipulated that "the language of the [1982] policy ... shall be deemed to have been continuously in effect since prior to 1980 [the date of River's doorway accident]." River never sought relief from the stipulation in the trial court. This Court has previously held that stipulations, entered voluntarily, "bind the parties themselves. To hold anything else would be to reduce stipulations to mere inconsequential gestures." *United States v. Sandles*, 80 F.3d 1145, 1148 (7th Cir.1996). River is bound by the language of the stipulation and the terms of the 1982 policy control.

Finally, the fact that the terms of the two policies differed with respect to the one-year provision is irrelevant. As discussed earlier, this Court has not considered the merits of the plaintiff's claim concerning the applicability of the one-year provision because we held that the plaintiff failed to adhere to the Commercial policy's twenty-day notice requirement; this determination alone is sufficient to resolve River's claim.

## CONCLUSION

The district court properly entered summary judgment in favor of Commercial. The clear evidence in this case reveals that the plaintiff failed, under the terms of the policy, to provide notice of his "injury" within twenty days of the date of his disability. As such, the policy does not allow River to collect "injury" benefits for the remainder of his life. Furthermore, the plaintiff has failed to adduce any evidence to demonstrate that the stipulation between the parties providing that the language of the 1982 insurance policy was guiding was invalid.

AFFIRMED.