In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2417, 99-2459

Fulcrum Financial Partners,

Plaintiff-Appellant/Cross-Appellee,

v.

Meridian Leasing Corporation,

Defendant-Appellee/Cross-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 97 C 6074--John A. Nordberg, Judge.

Argued April 17, 2000--Decided October 26,
2000

 Before Fairchild, Posner, and Diane P. Wood,
Circuit Judges.

 Diane P. Wood, Circuit Judge.  Fulcrum
Financial Partners (Fulcrum) and Meridian
Leasing Corporation (Meridian) worked as
partners in the computer leasing
business. When the parties' relationship
began to break down over a series of
disputes, they entered into a
comprehensive Settlement Agreement. The
question now before us is how much that
Agreement really resolved. Fulcrum took
the position that it did not cover all
disputes between the parties and
accordingly brought an action alleging
that Meridian owed it money arising from
a few discrete business transactions.
Meridian and Fulcrum filed cross motions
for summary judgment, which the district
court granted in part and denied in part.
The parties have filed cross-appeals.

I

 Underlying this dispute is a tangled web
of business relationships. Fulcrum is a
general partnership in the business of
leasing computer equipment. Until January
25, 1995, Meridian was a general partner
of Fulcrum. Article 7 of the partnership

agreement appointed Meridian as the remarketing agent in charge of re-leasing or selling Fulcrum's equipment when equipment leases terminated. Meridian was also a general partner in another partnership, FFP Acquisition Partners (FFPA). The other partner in the FFPA partnership was T.I.C. Leasing Corporation (T.I.C.). FFPA, in turn, owned 98 percent of Fulcrum. (T.I.C., which was owned by Turner Broadcasting System, Inc. (TBS), was eventually sold to Computer Systems of America (CSA).)

A series of disputes erupted among the various partnerships, quickly followed by two lawsuits, one in Georgia and the other in Illinois. On January 25, 1995, Meridian, Fulcrum, FFPA, T.I.C., TBS, and CSA entered into a written Settlement Agreement that contained the following language with respect to its coverage:

WHEREAS the parties to this Agreement now desire to fully and finally settle all existing disputes and claims among themselves, including, without limitation, the matters raised in the Georgia lawsuit and the Illinois lawsuit and certain other matters resolved under this Agreement;

* * *

In consideration of the promises made herein, CSA, TBS and T.I.C., on its own behalf and on behalf of FFPA, and for their administrators, executors, attorneys, successors, assigns, personal representatives, agents, servants, employees, affiliated entities, parents, officers, directors, shareholders, and all other persons claiming by, through and under them, do hereby fully, finally and forever release, remise, discharge and forever acquit Meridian and its administrators, executors, attorneys, successors, assigns, personal representatives, agents, servants, employees, affiliated entities, officers, directors, shareholders, and all other persons claiming by, through and under them, of and from any and all claims or causes of action for damages or injunctive relief, expenses, lost profits, attorneys' fees, liens, punitive damages, penalties and/or other potential legal or equitable relief of every kind and nature including but not limited to any claim which was or could reasonably

have been raised in the Georgia lawsuit, except that this release is not intended to, and shall not, act as a release of any claims based in whole or in part on facts or occurrences which were actively concealed by Meridian or which arise, in whole or in part, on or after the date of this Agreement or under this Agreement or the exhibits hereto.

In addition to settling claims, the Settlement Agreement provided that Meridian would withdraw from its partnerships with both FFPA and Fulcrum and transfer its interests in those partnerships to CSA. But the separation was not an unqualified one. Instead, according to the Settlement Agreement, "Meridian [would] remain remarketing and lease administration agent to Fulcrum at no cost to Fulcrum on such terms as set forth in Exhibit D." Exhibit D, in turn, said that "these terms shall govern the remarketing arrangements between Fulcrum and Meridian."

Regrettably, the Settlement Agreement did not provide the global peace that parties usually hope for. Instead, new problems arose over Meridian's remarketing responsibilities, which led to Fulcrum's decision to file the present action on August 29, 1997. Its complaint alleged three separate claims. The first two involved the proper distribution of sales proceeds from one of Meridian's remarketing transactions. The third alleged that Meridian improperly usurped a business opportunity from its former partner. The parties filed cross-motions for summary judgment. Fulcrum prevailed on Count I and Meridian on Counts II and III. We review a grant of summary judgment de novo, Silk v. City of Chicago, 194 F.3d 788, 798 (7th Cir. 1999); the same standard of review also applies to contract interpretation, as it too is a question of law. River v. Commercial Life Ins. Co., 160 F.3d 1164, 1169 (7th Cir. 1998). For the reasons given below, we affirm in part and reverse in part.

II

A. Allocation of Proceeds of September 1996 Remarketing Transaction

Under the Settlement Agreement, Meridian was to serve as a remarketing agent for

Fulcrum's equipment. Some of this equipment was subject to subordinated debt owed to Meridian; some was not. In September 1996, Meridian remarketed four groups of equipment, referred to in this case as Schedule #4, Schedule #4A, Schedule #4A-UP, and Schedule #4D (or "the Escon channels"). The parties agree that Schedule #4 was "Equipment" as Exhibit D to the agreement defined the term, and that Schedules #4A and #4A-UP were "Upgrades," also as defined in Exhibit D. The parties therefore agreed that Meridian should receive the proceeds of the sale of the Schedule #4 Equipment and Fulcrum should receive the proceeds of the sale of the Schedules #4A and #4A-UP Upgrades. (We discuss in part C who should receive the proceeds for the Escon channels.)

The total sale price for all four groups was $770,000. The parties agreed that the fair market value of the Escon channels was $80,000. They could not, however, agree on a valuation of the remaining Schedules (#4, #4A, and #4A-UP), which meant that it was impossible at that point to allocate the proceeds of the sale between them. Meridian initially proposed a valuation of Schedule #4 of $345,000, leaving the value of Schedules #4A and #4A-UP at $345,000. Fulcrum disagreed and valued Schedule #4 at $230,000. Meridian went ahead with its valuation and sent Fulcrum a check for $340,000, representing its valuation of Schedules #4A and #4A-UP minus a $5,000 remarketing fee. Fulcrum disputed both the allocation amount and the payment of the fee; it therefore refused to cash the check.

At an impasse, the parties invoked Section IX of Exhibit D, which was designed to deal with remarketing transactions taking place after the Settlement Agreement in which both Equipment Subject to Subordinated Debt and regular Equipment and/or Upgrades are at issue:

Allocations.  In connection with any Remarketing involving both Equipment Subject to Subordinated Debt and Upgrades, any Remarketing proceeds (both sales price and lease rentals) shall be allocated between the Equipment Subject to Subordinated Debt and Upgrades on the basis of fair market value of the

respective components as of the effective date of such Remarketing. If Fulcrum and Meridian are unable to agree upon the respective fair market values, the allocation shall be settled by submission of the dispute to four (4) nationally recognized computer dealers . . . . Appraisal reports shall be submitted by each appraiser within seven (7) days after his appointment and the respective fair market values of the Equipment and Upgrade at issue shall be the arithmetic mean of all appraisals; provided, however, if any appraisal deviates from the arithmetic mean by more than twenty percent (20%), said appraisal shall be disregarded. . . .

Unfortunately for all involved, hindsight reveals that this provision left a good deal to be desired. Indeed, it is not even clear how it should be characterized. The parties refer to it as the "arbitration" provision, but this does not seem quite right. Rather than provide for binding arbitration of the allocation issue as a whole, the provision merely lays out a means of appraising the value of individual items in those cases where the parties disagree about fair market value. Moreover, the four "arbitrators" do not come to a decision; instead, each of them merely appraises the value of the Equipment and/or Upgrades and a mathematical formula takes care of the rest. In the end, however, it is not the terminology that matters for this case; because the parties have referred to this as the "arbitration" provision, we will do so as well.

 The contract contemplates that the respective fair market value of each item of sold Equipment and Upgrades will be determined independently. Although it would have made logical sense for it also to stipulate that the fair market value of the individual items should add up to the total sale price, nothing in the Agreement so states. Naturally, as believers in Murphy's Law would say, that omission proved to be exactly the problem here.

 As required by Section IX of the Agreement, the four arbitrators appraised the separate fair market values of Schedule #4, Schedule #4A, and Schedule #4A-UP. (The parties did not request a

fair market valuation for the Escon Channels (Schedule D), because they had already agreed that their fair market value was $80,000.) The parties did not instruct the arbitrators to adjust their appraisals of the individual schedules such that the total would equal $690,000 (the amount of the sale minus the value of the Escon channels). The arithmetic means of the four arbitrators' valuations for each Schedule were: Schedule #4: $337,500; Schedule #4A: $161,667; Schedule #4A-UP: $221,667. The total of the means of the three fair market valuations is $720,834. Taking into account the $80,000 for the Escon Channels, the total fair market valuation for the sale is $800,834. This valuation presents an obvious problem: it exceeds the actual total sale amount of $770,000 by $30,834, or about 4%.

The district court read Exhibit D to provide that any proceeds from the sale of Equipment Subject to Subordinated Debt would be paid to Meridian up to the amount of the debt. The balance, if any, would go to Fulcrum and any proceeds from the sale of Equipment not subject to subordinated debt would be paid to Fulcrum. To figure out the amount of sale proceeds from Equipment Subject to Subordinated Debt, the district court focused on the language in Section IX that provides that sale proceeds from mixed sales are to be "allocated between" Equipment and Upgrades "on the basis of" the fair market value of each. The district court interpreted this language to require that proceeds from the 1996 sale be allocated on a pro-rata basis. To determine the pro-rata shares, the district court took the mean fair market valuation of each Schedule (including the Escon channels) and divided the individual Schedule value by the total of the fair market valuation means (i.e., $800,834). The district court then took these percentages and multiplied them by the $770,000 actual sale price in order to determine how much of the actual sale price should be allocated to each Schedule. Under this approach, the district court arrived at the following adjusted allocations: Schedule #4: $324,506; Schedule #4A: $155,442; Schedule #4A-UP: $213,132; Escon Channels (Schedule D): $76,920.

Meridian raises three objections to the

district court's procedure. First, Meridian interprets the contract to provide that it should receive the fair market valuation of the Schedule #4 Equipment and that Fulcrum should receive whatever is left over. In support of its interpretation, Meridian argues that the arbitrators were supposed to allocate the purchase price "between" Equipment Subject to Subordinated Debt and Upgrades and that the district court erroneously allocated the proceeds "among" Equipment Subject to Subordinated Debt and each particular Upgrade. We are not persuaded. In fact, this argument clashes with the plain language of the "arbitration" provision, Section IX. According to Section IX, the allocation shall be made "on the basis of" the fair market valuations; importantly, it does not say that the fair market valuation must be the actual amount either party would receive. Why providing fair market valuations of each particular Upgrade makes any difference is mystifying; whether the Upgrades are valued as a group or whether they are valued individually and then totaled makes no difference.

 The definitions of "between" and "among" are not different enough to carry the day for Meridian. "Between" can mean "shared by," such as "by giving a portion of the total to each." Webster's Third New International Dictionary (1993). "Among" can mean "for distribution to" and "to be shared by." Id. The part of the agreement we are considering is titled "Allocation," and it refers to an "allocation between" Equipment and Upgrades. "Allocation" is defined as "the act of apportioning," id., and "apportion" is defined in turn as "to divide and assign in proportion" or "to divide and distribute proportionately." Id. Thus both the title of the provision and its plain language imply that there is a fixed pie that needs to be divided proportionately--and that is precisely what the district court did by using the appraisers' fair market valuations as the basis for its determination of the pro-rata shares of the sale proceeds. (We imagine that were the circumstances different--if, for example, the total sales proceeds exceeded the total of the means of the fair market valuations-- Meridian would not be urging such a construction, for in that case, any

excess, under Meridian's theory, would go to Fulcrum.)

 Second, Meridian argues that Fulcrum is bound by the arbitration and that this issue is not properly before the court. But we are not sure what that means, given the fact that the appraisals were neither intended to nor did they resolve the allocation question. There is thus no "award" that can be enforced on the only critical point. If Meridian believed that the appraisers had not completed their work, it should have sent the job back to them.

 Third, Meridian argues that even if the district court was correct to make the allocation on a pro-rata basis, the court erred in including the $80,000 for the Escon channels in determining the pro-rata shares. But this argument runs counter to a pro-rata methodology. The $770,000 sales price represented the value received for all four schedules; the $80,000 figure was nothing more or less than a private agreement on the appraisal of one of them. In determining what the pro-rata shares should be, it is necessary to include every item. Excluding some and including others would distort the percentages.

 The district court gave this part of the contract the only logical reading that was available. It allocated the sales price on the basis of the fair market values of each component, whether that value was ascertained by agreement of the parties or through the appraisal procedure in the contract. We therefore affirm the district court's ruling on Count I that Meridian is entitled to $324,506 for Schedule #4 and Fulcrum is entitled to $368,574 for Schedules #4A and #4A-UP. As Meridian has already paid Fulcrum $340,000, at this point Meridian need only pay Fulcrum the balance: $28,574.

B. Sprint Lease Upgrade

 In Count II, Fulcrum claims that Meridian overcharged it in the sale of an upgrade for a lease to Sprint. Meridian counters that Count II is barred by the release of claims in the January 25, 1995, Settlement Agreement.

 The history of this dispute is as

follows. On July 12, 1994, Meridian offered Fulcrum the opportunity to acquire an upgrade to the Sprint lease. Section 9.9 of the FFPA partnership agreement provided that before Meridian could sell any upgrades to equipment leased by Fulcrum's customers, Meridian had to offer Fulcrum the opportunity to purchase and lease the upgrade. T.I.C. accepted the offer by letter on July 14, 1994, indicating that it wanted Fulcrum to acquire the upgrade as proposed by Meridian. The gist of the complaint is that Meridian erroneously estimated the amount of the equity contribution Fulcrum would have to make, resulting in an overpayment of $52,278. Although the parties agreed (in writing) to the deal in July 1994, the sale was not consummated until January 27, 1995--two days after the settlement agreement was signed.

The district court saw this as a misrepresentation claim; Fulcrum argues that it is an unjust enrichment claim. We agree with the district court that the better way to frame the claim is one for misrepresentation or fraud, particularly as under Georgia law, "[t]he theory of unjust enrichment applies when as a matter of fact there is no legal contract." Brown v. Cooper, 514 S.E.2d 857, 860 (Ga. App. 1999); see also Stowers v. Hall, 283 S.E.2d 714, 716 (Ga. App. 1981). As there was a contract, Georgia law rules out unjust enrichment as a theory. In any event, the distinction between misrepresentation and unjust enrichment is one without a difference in this context. As we explain below, the claim turns on when it accrued, and under Georgia law either type of claim would not accrue until there are damages, which in this case would be Fulcrum's payment to Meridian.

Meridian argues that the Settlement Agreement released Fulcrum's claim, because the claim arose "in whole or in part, on or after the date of this [Settlement] Agreement." Fulcrum first argues it is not bound by the Settlement Agreement because it is not listed as one of the parties in the release provision. The district court found that this argument made little sense, because (1) it would be illogical for the critical provision of the Settlement Agreement-- the release--not to apply to one of the key parties; (2) Fulcrum is listed as one

of the parties entering into the Settlement Agreement more generally; and (3) the final "whereas" clause states that "the parties" to the Agreement want to "finally settle all existing disputes among themselves."

So far so good. But we still need to decide whether Fulcrum is bound by the release term of the agreement. The parties have devoted considerable energy to arguments over the question whether the language of the release provision itself demonstrates that Fulcrum is (or is not) so bound. We find it unnecessary to resolve this somewhat messy question, because there is an independent reason for concluding that Fulcrum is not bound for purposes of the claims at issue here.

Fulcrum argues that even if it is covered by the release provision, the provision does not apply to its claim against Meridian, because the cause of action accrued after the date of the release. Citing no case law, the district court disagreed and found that the Settlement Agreement released Fulcrum's claim, because "the elements of any of Fulcrum's claims were present before the date of the Settlement Agreement." The district court also found that the exception for claims "which arise, in whole or in part, on or after the date of this Agreement" did not apply.

We do not agree with the district court's reading of the release provision. The Settlement Agreement's exception provides "this release is not intended to, and shall not, act as a release of any claims based in whole or in part on facts or occurrences which were actively concealed by Meridian or which arise, in whole or in part, on or after the date of this Agreement." (Emphasis added.)

Under Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), we look to the forum state's (here, Illinois's) choice-of-law rules to determine the applicable substantive law. In contract disputes such as this one, Illinois respects the contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy. Vencor, Inc. v. Webb, 33 F.3d 840, 844 (7th Cir. 1994); Keller v. Brunswick Corp., 369 N.E.2d 327, 329 (Ill. Ct. App.

1977). Therefore, we look to Georgia law, which is the law expressly chosen in the Settlement Agreement, Hugel v. Corporation of Lloyd's, 999 F.2d 206, 211 (7th Cir. 1993), to determine when Fulcrum's claim accrued.

Under Georgia law, Fulcrum's claim--whether characterized as one for fraud (or misrepresentation) or unjustenrichment--did not accrue until January 27, 1995, after the date of the Settlement Agreement. One element of a fraud claim is damages. A fraud claim does not accrue until suit on the claim can be successfully maintained, see Limoli v. First Georgia Bank, 250 S.E.2d 155, 156 (Ga. App. 1978), and damages are required before a plaintiff can maintain a fraud action. See Garcia v. Unique Realty & Property Mgmt. Co., 424 S.E.2d 14, 16 (Ga. App. 1992); Pickelsimer v. Traditional Builders, Inc., 359 S.E.2d 719, 721 (Ga. App. 1987). Similarly, "a claim for unjust enrichment does not arise until the party accepts the benefit giving rise to the implied promise to pay." Akin v. PAFEC Ltd., 991 F.2d 1550, 1558 (11th Cir. 1993), citing Ga. Code Ann. sec. 9-2-7. Fulcrum experienced no damages until the sale was consummated and Meridian cashed Fulcrum's check. We therefore reverse the district court's finding that this claim was released by the Settlement Agreement and remand the claim to the district court for calculation of the damages.

C.  Schedule 4D Equipment ("the Escon Channels")

Count III of Fulcrum's complaint alleged that Meridian breached its duty to Fulcrum by acquiring and leasing the Escon Channels (an Upgrade) to one of Fulcrum's customers without first giving Fulcrum the opportunity to provide the Upgrade. The complaint alleges that Meridian breached its duty as Fulcrum's agent. Fulcrum seeks to recover the profits Meridian made on this transaction: $36,000. (The complaint also made claims to profits Meridian made on leases of Schedule #4B and #4C equipment. The district court ruled against Fulcrum on this aspect of its claim, but Fulcrum has elected not to challenge this part of the district court's ruling on appeal. We therefore disregard it as well.) As the Escon Channels were acquired and leased

in February 1995, this transaction is not covered by the Settlement Agreement's release provision. Other terms of the Settlement Agreement do apply, including the terms of Exhibit D, because this remarketing transaction post-dates the Settlement Agreement.

At issue here is what sort of a duty, if any, Meridian owed Fulcrum in its capacity as remarketing agent after the Settlement Agreement. Fulcrum argues that under the FFPA Agreement Meridian owed Fulcrum a duty of noncompetition. Meridian responds that because it had withdrawn from the FFPA partnership at the time of this transaction, that duty was no longer applicable. Fulcrum counters that Meridian's duty of noncompetition was carried forward in both the Settlement and the Remarketing Agreements. Meridian parries that the parties impliedly consented to eliminate that duty because although the FFPA partnership agreement expressly included a noncompetition clause, that clause was not repeated in the Settlement and Remarketing Agreements. Fulcrum then falls back on the argument that Meridian owed Fulcrum the common law duty of loyalty found in any agent/principal relationship, and that Meridian breached its duty as an agent by seizing for itself an opportunity belonging to its principal. Fulcrum also points to Ga. Code Ann. sec. 23-2-59 (prohibiting an agent from acquiring rights in a property which are antagonistic to the rights of the principal) in support of its contention that Meridian also had a statutory duty of loyalty. Although Fulcrum does not mention it, Ga. Code Ann. sec. 10-6-25 also supports its argument: "The agent shall not make a personal profit from his principal's property; for all such he is bound to account."

The district court ruled in Meridian's favor. The district court first found that Exhibit D did not provide for a duty of noncompetition, because it did not include an express provision stating as much. It found the Settlement Agreement's reference to the FFPA agreement to be too indirect to incorporate the FFPA agreement's duty of noncompetition. The district court also found the Georgia statute inapplicable because it could ascertain no relationship between the

parties and the State of Georgia. (The district court did not find the choice of law provision in the Settlement Agreement to be relevant.)

This is a close call. On the one hand, it would be simple to decide the matter based on the Georgia law of agency (both statute and common law) and general agency principles, such as those famously expounded by Judge Cardozo in Meinhard v. Salmon, 164 N.E. 545 (N.Y. 1928). Both provide that when an agent is serving a principal, the agent cannot usurp opportunities it comes across in that relationship for itself. See, e.g., Franco v. Stein Steel & Supply Co., 179 S.E.2d 88, 91 (Ga. 1970); Meinhard v. Salmon, 164 N.E. at 547; Restatement (Second) of Agency sec. 393 (1958). Applying these general principles to this case would lead to the conclusion that Meridian, as remarketing agent, had an agent/principal relationship with Fulcrum; thus, Meridian should not have taken a business opportunity without first offering it to Fulcrum.

But we cannot work from sweeping generalizations about agency law when the parties have created a more limited relationship. Meridian did have an agency relationship with Fulcrum by virtue of Exhibit D, but it was a limited rather than a general one. We must therefore look to the language of Exhibit D to determine the scope of Meridian's agency relationship with Fulcrum, and hence the nature of the obligations Meridian was under. See Peachtree Purchasing Co. v. Carver, 374 S.E.2d 834, 836 (Ga. App. 1988) ("[T]he right of an agent to engage in competitive business is dependent to a certain extent upon the character of the agency, the circumstances surrounding it, and the agreement, express or implied, of the parties . . . ."); see also Cutliffe v. Chesnut, 176 S.E.2d 607, 611 (Ga. App. 1970) ("the existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties") (citing Restatement (Second) of Agency sec. 376).

To understand Exhibit D, it is helpful to consider both the language of that agreement and the way it fits into the broader context of the other agreements entered into by the parties.

Section X of Exhibit D provides:

For its services as remarketing and lease administration agent, Meridian shall not be entitled to any fee or compensation, it being understood and agreed that its services shall be rendered as part of the consideration of the Settlement Agreement, and in order to continue its obligations under the Fulcrum Partnership Agreement notwithstanding Meridian's withdrawal therefrom as a partner; provided, however, Fulcrum shall reimburse Meridian for its reasonable out-of-pocket costs and expenses paid by Meridian to a third party in furtherance of its duties and responsibilities as remarketing and lease administration agent . . . (emphasis added).

The effect of this provision is to require Meridian, despite its withdrawal, to continue its duties as remarketing agent, as spelled out in the Fulcrum Agreement.

Turning to the Fulcrum Agreement, we see that its Article 7 appointed Meridian to be "Remarketing Partner." This provision said that "[t]he Remarketing Partner shall not be entitled to any compensation for performing any of its services hereunder, except for such reasonable out-of-pocket expenses as are set forth [elsewhere in the agreement]." The Fulcrum agreement also contained the following clause addressing competition among the partners:

1.9 Competition.  The Partners hereby acknowledge and agree that each Partner may engage in any activity whatsoever, whether or not such activity competes with or is enhanced by the Partnership's business and affairs, and no Partner shall be liable or accountable to the Partnership or any other Partner for any income, compensation, or profit that such Partner may derive from any such activity. Further, no Partner shall be liable or accountable to the Partnership or any other Partner for failure to disclose or make available to the Partnership any business opportunity that such Partner becomes aware of in such Partner's capacity as a Partner or otherwise. Notwithstanding the foregoing, nothing contained herein shall in any way relieve any Partner of liability for any breach of its fiduciary duties to the

Partnership. (Emphasis added.)

Until one reaches the last sentence, this paragraph seems straightforward enough, but at that point it becomes a bit hard to understand. On the one hand, it seems to derogate from the common law duty of noncompetition between agents and principals (and hence between partners). On the other hand, it holds as intact the partners' fiduciary duty to one another, which ordinarily might include their duty not to usurp opportunities that properly belong to the partnership. But "fiduciary duty" must mean something narrower than a competitive behavior, because the provision seems to anticipate and provide for competition between the partners. Furthermore, it is hard to reconcile a norm of unfettered competition among the partners with the right of first refusal that Fulcrum alleges it had.

If, however, Fulcrum had no right of first refusal, then it is possible to make sense of the entire paragraph. On the one hand, it allows the parties to compete among themselves, but on the other hand, to the extent that fiduciary duties unrelated to business opportunities might be triggered, those duties remain enforceable. This is just a way of allowing the specific language of the paragraph to limit the general reservation of rights at the end, which is the approach we believe a Georgia court would take. See Schwartz v. Harris Waste Management Group, Inc., 516 S.E.2d 371, 375 (Ga. App. 1999) ("Under general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive.").

Although Fulcrum urges that it had a right of first refusal, we find that this position is not consistent with the governing agreements. A right of first refusal was created in Section 9.9, "Conflicts of Interests, Upgrades," of the FFPA agreement. That section reads, in pertinent part:

(b) In the case of an upgrade by the General Partner [Meridian] or any affiliate thereto to any equipment of the Acquired Partnership [Fulcrum], the Acquired Partnership [Fulcrum] shall have a right of first refusal from Meridian in regard to owning such upgrade and the Limited Partner shall determine whether

to cause the Acquired Partnership [Fulcrum] to exercise such right of first refusal with respect to such upgrade. . . .

Section 9.9 of the FFPA agreement is not incorporated or even mentioned in Exhibit D. And while it is mentioned in the Settlement Agreement, it is a mere passing reference that does not incorporate the terms of that provision in any substantive way.

By agreement of the parties, the terms of Exhibit D governed Meridian's duties to Fulcrum with regard to this remarketing transaction. Because Exhibit D creates no right of first refusal, Meridian did not breach any contractual duty when it did not provide Fulcrum with a right of first refusal in this transaction.

III

For the reasons described above, we Affirm in part and Reverse in part. Specifically, we Affirm the district court's decision on Count I; we Reverse the district court's decision on Count II and Remand to the district court for a determination of Fulcrum's damages; and we Affirm the district court's decision on Count III. Each party shall bear its own costs on appeal.