KENNETH MORRIS *et al.*, a Co-Partnership, d/b/a Pla-Mor Lanes, Plaintiffs-Appellees, v. AUTO-OWNERS INSURANCE COMPANY, Defendant-Appellant.

Fourth District   No. 4—92—0540

Opinion filed January 21, 1993.—Rehearing denied February 10, 1993.

Duncan B. Cooper III and David A. Perkins, both of Heyl, Royster, Voelker & Allen, of Peoria (Karen L. Kendall, of counsel), for appellant.

Nelson & Stipp, P.C., of Hoopeston (Gordon R. Stipp, of counsel), for appellees.

JUSTICE LUND delivered the opinion of the court:
Defendant appeals from an order of the circuit court of Vermilion County awarding attorney fees and penalties in an action to recover under an insurance policy for damages to a bowling alley destroyed by fire. The insurer, defendant Auto-Owners Insurance Company, refused to pay plaintiffs under the policy, claiming they had violated the policy terms by fraud, false swearing, misrepresentation made during the claim investigation process, and arson. At a hearing following the jury verdict in favor of plaintiffs, the trial court held that defendant's refusal to pay under the policy had been vexatious and unreasonable

and awarded attorney fees and penalties pursuant to section 155 of the Illinois Insurance Code (Code) (Ill. Rev. Stat. 1989, ch. 73, par. 767). Defendant paid the judgment awarding the limit of coverage under the policy and appeals only the order granting attorney fees and penalties. Based on the facts stated below, we reverse.

In 1982, plaintiffs purchased the Pla-Mor Lanes bowling alley, located in Hoopeston, Illinois, from Robert and Ray Chestnut, for $225,000. The down payment of $50,000 was borrowed from the City National Bank of Hoopeston (Bank). The balance of $175,000 was to be paid to the Chestnuts in monthly payments of $1,774.96 over a 15-year period. In 1988, the $50,000 loan was refinanced and increased to $140,500 to cover the cost of new pinsetters. Monthly payments on this loan were $2,093. A second loan for $12,090 was taken out in 1989 to purchase additional repair parts. A third loan for $7,000 was taken out to repair the parking lot. This loan was an unsecured, single-payment note that would come due in September 1990. In March 1990, just prior to the fire, a loan of $16,000 was approved by the Bank but was still pending. At the time of the fire and destruction of Pla-Mor Lanes on April 11, 1990, all its contract and creditor obligations were current.

Defendant issued a commercial fire insurance policy to Kenneth and Joyce Morris in 1987. The policy provided for replacement coverage up to $325,000, plus personal property and equipment up to $80,000. The policy also covered business income or lost earnings up to $40,000. The policy had been purchased through L. Kincade and Associates Insurance Agency, where Joyce Morris had been employed since September 1989.

On April 11, 1990, at 9:51 p.m., a fire and explosion completely destroyed the building. Plaintiffs submitted a claim for insurance benefits on May 11, 1990, totaling $541,964.30. This claim was rejected as being in excess of the policy coverage of $445,000. An amended claim was filed on May 29, 1990, for the full policy limit of coverage, and this claim was denied on August 9, 1990. Defendant paid Robert Chestnut and Ray Chestnut $115,000 as additional insured parties and named beneficiaries under the policy. A sum of $137,968.19 was paid to the Bank as an additional named insured party and lien-secured creditor.

■ Plaintiffs contend that the insurer's denial of their fire loss claim was vexatious and unreasonable. While the question of whether the insurer's action and delay is vexatious and unreasonable is a factual one, it is a matter for the discretion of the trial court. Accordingly, the trial court's determination will not be disturbed on review

unless an abuse of discretion is demonstrated in the record. (*Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 832, 433 N.E.2d 378, 383.) Section 155(1) of the Code states:

"Attorney fees. (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." Ill. Rev. Stat. 1991, ch. 73, par. 767(1).

■ It is well established that no single factor, taken by itself, is controlling in determining whether an insurer is guilty of vexatious delay in refusing to settle. Rather, the totality of the circumstances, taken in broad focus, will determine the matter. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124, 371 N.E.2d 1147, 1149.) A refusal to settle is not vexatious *per se*. If there is a *bona fide* dispute about coverage, delay in settling a claim may not violate the statute. (*Mohr v. Dix Mutual County Fire Insurance Co.* (1986), 143 Ill. App. 3d 989, 999, 493 N.E.2d 638, 645.) In deciding whether attorney fees and penalties are appropriate under section 155 of the Code, we need only review the evidence existing prior to trial to determine the existence of a *bona fide* dispute.

The destruction of Pla-Mor Lanes was investigated by a total of five different arson investigators: a special agent for the United States Treasury Department, Bureau of Alcohol, Tobacco, and Fire Arms; two investigators for the Illinois State Fire Marshal's office; as well as two professional investigators hired by the insurer. Each investigator filed reports concluding that the exact cause of the fire and explosion was unknown. Even so, four of the five investigators concluded that the fire was of incendiary origin, being intentionally set and accelerated. The fifth investigator, James Oliver of the Illinois State Fire Marshal's office, concluded that the cause of fire was unde-

termined, suspicious in origin, and had reason to believe that the fire was "more intentionally set than accidentally set."

These conclusions were based on the overall investigation, including the nature of the fire and explosion, elimination of other possible causes, and the short time frame between the time the last person left the bowling alley and the explosion. Another key factor was that money was stolen from the bowling alley safe and from a freezer associated with the lunch-counter operation on the premises. Other crimes committed in a building at the time of a fire are considered a common cover-up for arson.

The Morris home is located approximately one block north of the bowling alley. On the evening of the fire an employee, Clayton Hinkle, opened the back door of the bowling alley to see if Kenneth Morris was at his nearby home, which was within view from the door. Although he did not distinctly remember locking the door afterward, it was a habit for him to do so and he assumed that he had locked the door. After the fire, investigators found the door unlocked.

At the time of the fire, Joyce Morris was at home, talking on the telephone with the wife of Rick Lawson. Kenneth Morris, accompanied by Lawson, was driving out in the country just outside of town drinking beer. According to one of the arson investigators, Kenneth became very nervous when asked to describe exactly where he had gone on the night of the fire. He stated that he and Lawson drove to a bar in the East Lynn area. When reminded of the fact that East Lynn does not have a bar, Kenneth changed his story, stating that they drove to a bar in Rossville. When asked for the name of the bar and if anyone could verify they were there, Kenneth again changed his account, stating that they actually just rode around in the country.

About a week after the fire, Kenneth Gustine and his wife were driving down a road outside Hoopeston. In testimony, the road is often referred to as either the "Landfill Road" or "Lovers' Lane." The Gustines were smoking marijuana and driving around because they did not want to smoke in front of their children. As they were driving, they noticed a bowling bag about 10 yards off the road, underneath a tree. They retrieved the bag and found that it contained checks payable to Pla-Mor Lanes and its lunch counter. They decided to hold onto the bag, thinking they could profit in one manner or another. Kenneth Gustine considered the possibility of blackmail, but was unable to decide on a course of action. On cross-examination, he revealed that one year prior to the fire, Kenneth's brother, Mike Morris, threatened to prosecute Nancy Gustine for writing some bad checks.

A few days later, the Gustines were again out driving and smoking marijuana on the "Landfill Road" when they passed a pickup going in the opposite direction. As the pickup passed, they recognized Kenneth Morris as the driver, with someone else in the passenger seat. Kenneth Gustine looked through his rearview mirror and saw Morris' brake lights go on near the spot where they had previously found the bowling bag filled with checks. Nancy turned in her seat and verified these events.

Soon after, Timothy Crabtree drove down the road in the same direction as the Gustines. He drove past the parked pickup and recognized Morris and Lawson sitting inside. As he moved on, he noticed the Gustines and stopped to talk. They asked Crabtree whom he had seen in the truck and, after learning it was Morris and Lawson, they told Crabtree all about the bowling bag filled with checks. At this point, Gustine decided to hand over the bowling bag to the Hoopeston police. Crabtree was not drinking, nor did he smoke any marijuana.

A few days later, Crabtree attended a firemen's ball in Hoopeston and claims to have overheard a conversation between Kenneth Morris and Tricia Pierce. Morris allegedly talked about his activities on the night of the fire. According to Crabtree, Morris said that on the night of the fire he had been driving down the "Landfill Road." According to Crabtree's testimony, Morris' statement established that he was driving past the same stretch of road where the bowling bag was eventually found. At trial, Pierce denied that Morris had ever spoken to her about this.

Kenneth Morris was given a polygraph test by the Illinois State Police to investigate whether he had participated in setting the fire. The results of these tests were only admitted into evidence at the hearing on the motion to award attorney fees. Police found indications of purposeful noncooperation on a number of specific questions, such as, "Did you plan with anyone to set fire to your bowling alley?" A second polygraph test was given, resulting in the same conclusion of purposeful noncooperation. Hinkle was also given a polygraph test. The test indicated deception when he denied planning to set fire to Pla-Mor Lanes. The examiner noted signs of purposeful noncooperation and, in a subsequent conversation with a Federal investigator, Hinkle admitted that he "helped" his polygraph examination by altering his respiratory rate.

Auto-Owner's Insurance Company hired the accounting firm of Campos & Stratis of Hoffman Estates, Illinois, to evaluate the financial condition of the Pla-Mor Lanes bowling alley. The investigation found that while the bowling alley seemed to be generating cash, the

partner's draw was relatively flat and then fell in 1990. Sales had been declining since 1986. In a review of assets and liabilities just four months before the fire, it was shown that liabilities exceeded assets by $132,776.98. The report stated:

> "We have seen no evidence that would suggest that the insureds' financial condition had improved at the time of the fire. We have reason to believe that the financial condition was worse at the time of the fire than it was at December 31, 1989[,] based upon declining sales and profits.
>
>         * * *
>
> \*\*\* [T]he business was not going to generate enough cash to remain current on loan payments. \*\*\* Cash would have had to have been put into the business just to break even for the year.
>
>         * * *
>
> It is our opinion \*\*\* that the insureds' financial condition would be greatly improved by receiving the claimed insurance policy limits. It is our opinion that Pla-Mor Lanes was insolvent and that future operations were not going to generate cash that would have improved its financial condition that would have enabled Pla-Mor Lanes to be a solvent, going concern."

The report concluded that receiving the insurance policy limits of $445,000 would have enabled the insureds to pay off all outstanding liabilities and have excess cash totaling $181,000. This excess cash was calculated to be the equivalent of approximately 12⅓ years of operating the bowling alley based upon projected cash profits for 1990.

    ■ We recognize that some of the evidence summarized above was successfully rebutted, in whole or in part, at trial. This fact is irrelevant to our inquiry. The proper focus of our determination is only whether defendant reasonably relied upon evidence sufficient to form a *bona fide* dispute. An arson defense to an insurance claim is most commonly established by circumstantial evidence and is comprised of three basic elements: incendiarism, access, and motive. (*Dark v. United States Fidelity & Guaranty Co.* (1988), 175 Ill. App. 3d 26, 31, 529 N.E.2d 662, 666.) Evidence of incendiarism was firmly established, as was evidence of financial motive.

    Evidence of the second element, access, was limited to the fact that, at the time of the fire, Joyce Morris was at home, only one block away from the rear entrance of the bowling alley. She had keys to the premises, which were normally kept locked. The back door, which faced her home, was later found by fire investigators to be unlocked. When the fire started, she was talking on the phone with Rick Law-

son's wife. Kenneth Morris, accompanied by Lawson, was driving around the countryside just a few minutes from the bowling alley. Both Kenneth and Joyce rely on the Lawsons for their alibis.

The only evidence suggesting a direct link between the Morrises and the fire is testimony of Nancy and Kenneth Gustine and Timothy Crabtree. While this evidence suggests a connection involving Kenneth, it has no bearing on Joyce's involvement. We agree with the trial court's finding that defendant produced no evidence to connect Joyce to the fire loss. We note, however, that shortly after completing depositions in the case, defendant offered to settle with Joyce for one-half the proceeds available under the policy. The offer was made on May 30, 1991, and was conditioned upon her rebuilding or replacing the business, according to the policy terms. In October 1991, defendant was informed by its accountant that plaintiffs' business interruption loss totaled $40,000, the limit of coverage. About a month later, defendant offered Joyce $20,000, one-half the value under the policy. Given the suspicious nature of the fire and surrounding circumstances, we find defendant was entitled to fully explore the possibility of Joyce's involvement through the discovery process. The fact that an offer to settle was made soon after depositions were completed is sufficient to refute the trial court's conclusion of vexatious delay.

In regard to Kenneth, the court found (1) the polygraph examination was inconclusive; (2) a failure of proof and no evidence to connect him to the fire; and (3) that it was unconscionable for defendant to rely on the testimony of the Gustines and Crabtree, which the court found noncredible. At the hearing on the motion for a finding of vexatious refusal held on February 28, 1992, the court stated its reasons for holding defendant's reliance on the testimony of Kenneth Gustine and Crabtree to be unconscionable.

> "These were people that, by their own admissions, ride out in the country, riding around, smoking marijuana, a substance which everyone knows can affect one's ability to see and recall, one's ability to perceive things (Hearing Transcript, February 28, 1991, p. 51)."

Later, at a hearing on a post-trial motion, the court stated:

> "The evidence that the company is relying upon appears to be the statements of the Gustines and Mr. Crabtree. And the Gustines I would find to be not credible witnesses. I think they are not. They had admitted they violated the law, which smoking marijuana or even having possession of marijuana is a violation of the Illinois Statutes. They admitted they had been, at least Mr. Gustine had admitted that he was thinking of blackmail,

which certainly significantly affects his credibility. That's a violation of the law."

At the February 28, 1992, hearing, the trial court agreed that defendant had reasonably relied upon the opinions of the arson investigators who determined that the fire had been intentionally set. The court also found that it was reasonable to infer that whoever took the money from the safe and the lunch counter had inside information or knowledge regarding the location of the money. Defendant argues that the trial court's only complaint was defendant's reliance on the testimony of Kenneth Gustine and Crabtree. Defendant contends the court's ruling states, in effect, that defendant had a *duty* to reject the testimony of witnesses who were consuming marijuana during the time period that was the subject of their testimony.

We disagree. Although the possession and use of marijuana appears highly significant to the court's decision, the court also considered a variety of other factors such as the Gustines' thoughts of blackmail and the bad checks written by Nancy Gustine to Mike Morris. While we do not fault the trial judge for her negative evaluation of the Gustines as witnesses in determining the issues now before this court, the totality of the information available to defendant prior to trial must be considered. Missing from the court's analysis is the fact that the Gustines' testimony was corroborated by Crabtree, who was neither using marijuana nor drinking alcohol. Also missing is any mention of Crabtree's testimony that he overheard Morris say that he was driving on the "Landfill Road" on the evening of the fire. Gustines' and Crabtree's testimony were relevant and probative. Perhaps the jury, as well as the court, rejected the Gustines' testimony—but why should the defendant be charged with prior knowledge of the fact finder's valuation of testimony?

We find the trial court's emphasis on the credibility of the Gustines' testimony to be out of proportion to the wide body of evidence relied upon by defendant in its decision to deny coverage. Defendant's actions were based upon evidence which has as its foundation the reports of numerous certified experts concerning an event surrounded by a wealth of suspicious circumstances. There was evidence indicating that the fire was the result of arson, the bowling alley was in financial difficulty, Morris was seen parked in the country near a spot where checks stolen from the bowling alley were later found, and Morris changed his story regarding his whereabouts on the night of the fire. Morris' purposeful noncooperation with the polygraph tests, while not admissible on the question of guilt, must also be considered in evaluating defendant's decision to deny coverage.

The rule of law applicable to this case is adequately stated as follows:

> "[T]he statutory penalty for vexatious refusal of an insurer to pay a claim should not be inflicted unless the evidence and circumstances show that such refusal was wilful and without reasonable cause as the facts appeared to a reasonable and prudent man *before the trial*; and it is not enough that the judgment, after trial, is adverse to the insurer." (Emphasis added.) (44 Am. Jur. 2d *Insurance* §1772, at 760 (1982).)

Furthermore, the statute from which the judgment is now appealed must be strictly construed, because the provisions are penal in nature and in derogation of the common law. 44 Am. Jur. 2d *Insurance* §1772, at 759 (1982).

We hold the evidence existing prior to trial was justification for the defendant's position and the finding of vexatious litigation must be reversed.

Reversed.

McCULLOUGH and KNECHT, JJ., concur.