ST. PAUL MERCURY INSURANCE COMPANY, Plaintiff,

v.

Ellen D. FOSTER, as Executrix of the Estate of Thomas S. Foster and as Co–Trustee of the Thomas S. Foster Trust executed April 14, 1994, et al., Defendants.

No. 01–1382.

United States District Court, C.D. Illinois, Peoria Division.

June 26, 2003.

David E. Jones, L. Lee Smith, Hinshaw & Culbertson, Peoria, IL, Bradley M. Jones, Richard Pemberton, Stacy Broman, Robert Salmon, Meagher & Geer, Minneapolis, MN, Michael P. Tone, Ross, Dixon & Bell, Chicago, IL, for Plaintiff.

Charles G. Roth, James W. Springer, Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, Michael T. Graham, Nancy G. Ross, McDermott, Will & Emery, Chicago, IL, for Ellen Foster.

Michael T. Graham, Nancy G. Ross, McDermott, Will & Emery, Chicago, IL, for Northern Trust Co.

Charles G. Roth, James W. Springer, Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, for Melvin Regal, Stephen Bartley, Henry Greggory, II, Richard Hodgson, John Lappegaard, George McKittrick, Michael Norbutas, Clayton Patino, Grederick Stuber, Mark Swedlund, Leo Vandervlugt, Bruce Wright.

William Bay, Richard Paulter, Matthew S. Darrough, Thompson & Coburn, St. Louis, MO, for Robert Ostertag, Jr., Terry Cole, Alan Dix, Jon D. Elletson, A. Robert Pelligrino.

Dean Rhoads, Robert Rhode, Edward Sutkowski, Steven Oates, Sean Anderson, Sutkowski & Rhoads Peoria, IL, for Debra Keach, Patricia Sage.

Stephen D. Gay, Jeffrey Alan Ryva, Husch & Eppenberger, Peoria, IL, for Lyle Dickes.

Jeffrey B. Rock, Hasselberg, Rock, Bell & Kuppler, Peoria, IL, for James N. Freid.

William Gehring, Peoria, IL, pro se.

Dean Essig, Washington, IL, for Greggory McAllister.

James Kyle, Tipp City, OH, pro se.

Jerry Rathmann, Tipp City, OH, pro se.

John Halpin, pro se.

R. Michael Henderson, David B. Collins, Quinn, Johnston, Henderson & Pretorius, Peoria, IL, for AON Financial Services Group, Inc.

## ORDER

MICHAEL M. MIHM, District Judge.

This matter is now before the Court on several Motions for Summary Judgment. For the reasons set forth below, St. Paul's Motion for Summary Judgment [# 167] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. The Motion for Summary Judgment by Northern Trust and Ellen Foster as the Co-Trustees of the Thomas Foster Trust [# 191] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. Aon's Motion for Summary Judgment [# 193] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. The Motion for Summary Judgment by the Cole Defendants [# 224] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART, and the Motion for Summary Judgment by Ellen Foster as the Executrix, et al., [# 195] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART.[1]

## FACTUAL BACKGROUND

Foster & Gallagher, Inc. ("F & G") was a direct marketing firm engaging in the marketing of gifts, housewares, horticultural products, and novelty items through the mail. The Defendants in this suit are the named defendants in the *Keach v. U.S. Trust, et al.,* case also pending before this Court, which includes the former officers, directors, and shareholders of F & G. From February 23, 1999, to December 5, 2000, Aon Financial Services Group ("Aon") was F & G's insurance broker of record for various policies.

In 1999, F & G had a one-year package policy through CNA which combined Directors & Officers ("D & O"), Fiduciaries' Liability, and Employment Practices Liability coverage for the period from March 20, 1999, through March 20, 2000. At F & G's request, Aon obtained quotations for the placement of D & O, Fiduciaries' Liability, and Employment Practices Liability coverage to be effective March 20, 2000. Aon's Ross Wheeler ("Wheeler") submitted F & G's insurance request with its 2000 Underwriting Submission (St. Paul Exhibit F) to various insurers, including Rahsaan Yearwood ("Yearwood"), an underwriter in St. Paul Mercury Insurance Co.'s ("St.Paul") Chicago office. Unlike the 1999 Underwriting Submission that had been sent to CNA the prior year, it does not appear that the 2000 Underwriting Submission sent by Wheeler contained a completed fiduciary liability application, a listing of each plan to be covered, Form 5500 reports for each of the plans for which fiduciaries' liability coverage was being sought, or a copy of the CNA policy that was being replaced. However, St. Paul does not dispute that the F & G ESOP was the only ERISA plan specifically identified in the 2000 Underwriting Submission.

---

1. The rulings contained herein are in some instances different from the preliminary rulings that the Court announced to the parties prior to the beginning of oral argument in this matter on June 17, 2003. As a result of the oral argument, the Court was persuaded to change its threshold ruling on the question of coverage under the policy, which then in turn influenced other rulings presented in the motions.

On March 6, 2000, Yearwood issued a quotation or "indication" reflecting the terms that St. Paul was offering. The indication stated that it would provide fiduciaries' liability coverage but did not expressly include or exclude the ESOP from this coverage. Nor did the indication list the FPMS93 "Amend Definition of Plan" endorsement ultimately relied on by St. Paul to exclude ESOP coverage as one of the endorsements to be effective at inception. Upon receiving the indication, Wheeler asked Yearwood if St. Paul would provide omnibus wording or coverage for "all plans;" Yearwood responded that he would "look into the wording" or words to that effect. An indication was also received from Continental Casualty Company, which was similarly priced and undisputedly included coverage for the ESOP.

F & G ultimately selected the St. Paul indication, and Yearwood issued a binder on March 20, 2000. The binder did not specifically reference coverage or exclusion of the ESOP but, like the indication, did not list the FPMS93 endorsement as one of the endorsements to be effective at inception. Aon then issued its own "confirmation of order" to F & G on March 20, 2000. However, Yearwood left his employment with St. Paul before the F & G policy was issued.

St. Paul issued a D & O liability policy that included Fiduciaries' Liability and Employment Practices Liability coverage, policy number 512CM0216, with effective dates of March 20, 2000, to March 20, 2003 (hereinafter the "Policy"). The Policy was initially delivered to Aon on May 31, 2000. (St. Paul Ex. Q) The Policy included fiduciaries' liability coverage; however, the endorsement adding fiduciary coverage stated that coverage would be afforded only to plans listed in Item 11 of the endorsement, and no plans were listed in that item. It is also undisputed that this version of the Policy did not include the FPMS93 endorsement specifically excluding coverage for the ESOP. Wheeler reviewed the Policy and wrote to St. Paul on June 1, 2000, identifying several perceived errors, including the omission of omnibus wording or other language confirming that the coverage applied to all plans, including the ESOP.

St. Paul reissued the Policy in October 2000, after purportedly making corrections to provide coverage for all of F & G's ERISA plans except the ESOP. (St. Paul Ex. X) This version of the Policy contained an undated version of the FPMS93 endorsement specifically excluding coverage for the ESOP that was not present in the first version of the Policy. Wheeler was apparently out of the office when this version of the Policy was received. Michael Rekruciak ("Rekruciak"), Wheeler's supervisor at Aon, reviewed the "reissued" policy and sent it on to F & G under cover of a letter dated October 23, 2000. In his cover letter, Rekruciak stated that while the primary policy "was incorrect when it was issued .... [w]e finally received the corrected version of this primary policy on October 12, 2000."[2]

Although Aon was terminated as F & G's broker of record on December 5, 2000, a third copy of the F & G Policy was delivered to Aon on December 26, 2000. (St. Paul Ex. Y) This version of the Policy contains a version of the FPMS93 endorsement dated December 19, 2000, that specifically excludes fiduciary coverage for the

---

2. Aon suggests that the version of the policy received in October 2000 may have been something other than St. Paul Ex. X. However, if the version approved by Aon in October 2000 was something other than St. Paul Ex. X, the record is devoid of evidence indicating what that may have been. St. Paul Ex. X and the December 2000 version were the copies of the policy that were in the section of Aon's file for delivered policies.

ESOP. After reviewing the policy, Wheeler sent an internal memorandum to Lisa Johnston ("Johnston"), the person at Aon in charge of the F & G account, in which Wheeler indicated that he found the policy to be "in order and satisfactory based upon negotiations." Johnston then forwarded the Policy to F & G with a letter stating that "the policy now conforms to the terms and conditions as quoted. . . ."

On January 31, 2001, Attorney Dean Rhoads ("Rhoads") sent a letter on behalf of his clients to the ESOP Administrative Committee and the President of F & G requesting a copy of the most recent plan description, information concerning the 1995 stock purchase transaction, and other types of information. During February 2001, Diana Jacobs ("Jacobs") of the Hobbs Group, F & G's new insurance broker, reviewed the St. Paul Policy and began to inquire about whether the F & G ESOP was covered. On March 6, 2001, David Hanson, F & G's insurance manager, asked Jacobs when he would receive an answer/clarification as to the coverage of the ESOP. That same day, Jacobs responded by stating, "Intent is to cover ESOP" and requesting the official name of the ESOP plan.

Over the next month, Jacobs communicated with Shauna Conley ("Conley"), the St. Paul underwriter who eventually replaced Yearwood in handling the F & G account. Based on her review of St. Paul's file, Conley determined that the parties had intended to provide coverage for the ESOP and that F & G had paid a premium consistent with ESOP coverage. She agreed (on behalf of St. Paul) to remove the ESOP exclusion from the Policy effective from the date of issuance. In reaching this conclusion, Conley conferred with her supervisor, Caroline Nelson ("Nelson"), but never spoke with Yearwood.

Rhoads filed suit against various officers and directors of F & G and U.S. Trust on April 6, 2001. On April 10, 2001, Hanson finally responded to Jacobs' request for the ESOP plan name, which Jacobs forwarded to St. Paul on April 11, 2001. On April 12, 2001, F & G contacted its corporate counsel to request assistance in notifying St. Paul of the filing of the *Keach* suit. F & G's corporate counsel prepared a draft letter, which was not sent to St. Paul until 4:25 p.m. on April 16, 2001, which was approximately one hour after Jacobs informed F & G that Conley had agreed to remove the ESOP exclusion from the policy. On April 17, 2001, Conley e-mailed Jacobs an endorsement titled "Cancel An Existing Endorsement" that purported to cancel the FPMS93 endorsement containing the ESOP exclusion. However, Conley never amended the policy to add the F & G ESOP as a covered plan under the fiduciaries' liability supplement or added an endorsement containing omnibus wording.

Upon receipt of the notice of the *Keach* suit, St. Paul communicated a reservation of rights, including the right to deny coverage, dated May 14, 2001. On September 12, 2001, after receiving additional information from F & G, St. Paul denied coverage for the allegations asserted in the original *Keach* Complaint on multiple grounds. St. Paul again denied coverage on multiple grounds based on the allegations contained in the First Amended Complaint on October 2, 2001.

On September 14, 2001, St. Paul brought this declaratory judgment action to declare the parties' rights and responsibilities under the policy. Certain Defendants then filed a Third Party Complaint bringing Aon into this case. Both St. Paul, the various Defendants, and Aon have now moved for summary judgment, and this Order follows.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v.*

*Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

## DISCUSSION

Several cross motions for summary judgment have been filed in this case, and parties have also adopted the motions filed by others. Accordingly, rather than organizing this section of the Order by motion, the Court will address the specific issues and arguments presented in the various motions in turn.

### I. *Coverage for the ESOP*

Defendants Foster, et al., argue that the Policy, as written, provides coverage for the *Keach* suit. This argument is wisely not based on the contention that the Policy received by Aon in December 2000 provides coverage as written, for that version of the Policy clearly excludes coverage for the ESOP through the FPMS93 endorsement. Rather, these Defendants assert that as the underwriter assigned to the F & G account, Conley's determination that a mutual mistake had been made in drafting the policy and that the ESOP should have been covered from the inception is binding on St. Paul as a voluntary reformation and must be enforced by this Court.

"Reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing." *Indiana Insurance Co. v. Pana Community Unit School Dist. No. 8,* 314 F.3d 895, 903–04 (7th Cir.2002). The intent of a reformation is to make the contract express the agreement that the parties intended the contract to express. *Id.* In order to reform a contract, "the mistake must be of fact and not of law, mutual and common to both parties, and in existence at the time of the execution of the instrument, showing that at such time the parties intended to say a certain thing and, by

mistake, expressed another." *Zannini v. Reliance Ins. Co. of Illinois, Inc.,* 147 Ill.2d 437, 168 Ill.Dec. 820, 590 N.E.2d 457, 462 (Ill.1992). In other words, the party seeking reformation must establish:

> (1) there has been a meeting of the minds resulting in an actual agreement between the parties; (2) the parties agreed to reduce their agreement to writing; and (3) at the time the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted either through mutual mistake or through mistake by one party and fraud by the other.

*Indiana Insurance,* 314 F.3d at 904.

▮ Here, Defendants point to the following conduct by Conley as creating enforceable contract terms through voluntary reformation: On April 17, 2001, Conley sent an email to Jacobs attaching an endorsement entitled "Cancel an Existing Endorsement" that stated in relevant part:

> In consideration of the premium charged, it is understood and agreed that: The attached Policy is amended by canceling and terminating a certain endorsement (hereinafter called Canceled Endorsement) attached to the said Policy and more fully described as follows: ENDORSEMENT NO. FPMS93 Ed. 1–99 so that from and after the effective date hereof the attached Policy shall continue in force without the amendment contained in the said Canceled Endorsement.

Conley's email also stated that the original endorsement would follow by mail and that she was happy that they were able to resolve the issue. On April 18, 2001, Conley responded to a question from Jacobs regarding how the ESOP coverage would be derived in the Policy by stating that she was "doing some research as to how we (The St. Paul) can cleanly provide the omnibus wording (standard in SP form) in addition to adding the ESOP. I believe it involves a manuscript endorsement—will have an answer very, very soon." Later that day, Conley sent another email stating:

> Need to review a couple of manuscript endorsements designed to add omnibus wording and the ESOP. We may have to attach the FPMS93 endorsement which adds the omnibus wording but deletes the ESOP and then endorse the policy again to specifically include the ESOP. Again working to provide the cleanest and clearest option for the client. Should have an answer by the end of the week. In the meantime, The St. Paul agrees to provide coverage as follows: omnibus wording on the Fiduciary Policy in addition to full coverage for the Foster & Gallagher's ESOP on policy 512CM0216.

Conley's representations were confirmed by her supervisor, Nelson, during Nelson's deposition, as well as in a contemporaneous note indicating that she and Nelson had "determined the ESOP exclusion should be removed as it does not appear that it was used properly, parenthesis, mistaken for omnibus wording exclusion, end parenthesis. Need to add onto this wording and include ESOP. Caroline agreed."

St. Paul does not deny that Conley was its employee or that she had actual and apparent authority over the F & G account but rather asserts that what Conley did was a modification of the contract for which no consideration was given. However, its modification argument assumes that coverage for the ESOP was never bargained for and effectively ignores the findings and representations of its own agents, Conley and Nelson.

After reviewing the file, Conley and Nelson determined that there had in fact been a meeting of the minds between F & G

(through Aon) and St. Paul that resulted in an actual agreement to provide coverage for the ESOP from the inception of the Policy. Such agreement was reduced to writing, but during this process, St. Paul failed to include the ESOP under Item 11 as a covered plan. Then at some later point, St. Paul mistakenly inserted the ESOP exclusion through FPMS93, which Conley's notes indicated was not used properly and was probably mistaken for an omnibus wording exclusion. Thus, the requirements set forth in *Zannini* and *Indiana Insurance* were met, and Conley voluntarily undertook efforts to reform the policy to correct the error. The fact that she did not formally complete her task is really irrelevant, as St. Paul admits that it put a halt to her efforts once notice of the *Keach* claim filtered through its system. However, St. Paul never rescinded her representations to F & G that St. Paul agreed to provide omnibus wording on the Fiduciary Policy in addition to full coverage for the F & G ESOP on policy 512CM0216 or attempted to charge an additional premium for what they now claim was new coverage.

■ St. Paul argues that once a mistake is made in drafting a policy, it takes an exercise of a court's equitable powers to accomplish a reformation. However, there is some authority for the proposition that the parties to a contract may engage in a voluntary reformation that can then be enforced by the courts. In *L.E. Myers Co. v. Harbor Insurance Co.*, 67 Ill.App.3d 496, 24 Ill.Dec. 182, 384 N.E.2d 1340, 1342 (1st Dist.1978), *aff'd*, 77 Ill.2d 4, 31 Ill.Dec. 823, 394 N.E.2d 1200 (Ill.1979), the Illinois Appellate Court addressed a situation where the primary carrier and insured agreed that there had been a mutual mistake, engaged in a voluntary reformation of the policy, and then sought to enforce the reformation against the excess carrier. The court found that the excess carrier was bound by the terms of the voluntarily

reformed contract and did not take issue with the parties' assertions that in a proper case for reformation, "the parties may do voluntarily what a court of equity would have compelled them to do, and with the same effect." *Id.* at 1344. The court also acknowledged several other instances where state courts had enforced voluntary reformations by the parties. *Id.* at 1345, *citing Coakley v. State*, 20 Misc.2d 831, 196 N.Y.S.2d 793, 796 (N.Y.Ct.Cl.1960); *Utica Mutual Ins. Co. v. Monarch Ins. Co. of Ohio*, 250 Cal.App.2d 538, 58 Cal.Rptr. 639 (1967); *Burlingham v. Hanrahan*, 140 misc. 512, 251 N.Y.S. 55 (N.Y.Sup.1931).

Similarly, in *Great Atlantic Ins. Co. v. Liberty Mutual Ins. Co.*, 773 F.2d 976, 978 (8th Cir.1985), the Eighth Circuit addressed an appeal from a district court decision recognizing a voluntary reformation. Again, an excess carrier argued that the insured and primary carrier could not voluntarily reform the primary contract retroactively to the detriment of the excess carrier. *Id.* at 980. The Eighth Circuit disagreed, relying largely on the *Myers* case. *Id.*

During oral argument, St. Paul argued that these cases stand alone. However, the fact that there is little precedent on an issue is quite different from suggesting that the precedent is contrary to other controlling precedent, which St. Paul has not attempted to demonstrate. Perhaps there are so few cases because insurers who engage in voluntary reformation to correct mutual mistakes do not often attempt to renege on their agreement to correct the mistake, and there is no resultant need for litigation.

The Court notes that both of the published cases on the issue of voluntary reformation involved an effort by a third-party to avoid the consequences of a voluntary reformation by the parties to the original contract. If voluntary reformation is

enforceable where it would adversely affect the rights of third-parties, this would seem to be an even more compelling case for the enforcement of a voluntary reformation because the Defendants are only seeking to enforce the reformation against St. Paul, as the party who agreed to correct the policy to eliminate the mistake and provide the originally bargained for coverage. The Court would also note that permitting and enforcing voluntary reformations by private parties is good policy in the abstract, as it encourages parties to contracts to correct their own mistakes without resorting to costly litigation.

This is not a case where an agreement was reached by someone who did not have authority to bind St. Paul by such an agreement. Rather, an agent of St. Paul, who admittedly had authority to underwrite policies, enter into agreements, and bind St. Paul to coverage, made an independent determination that there had been a mutual mistake that resulted in the erroneous exclusion of the F & G ESOP from coverage, discussed the situation with her supervisor, received approval from the supervisor to reform the contract to conform to the parties' original intent as she had concluded it to be from her investigation, communicated her determinations to the insured (including an endorsement deleting the ESOP exclusion), and represented in very clear and unambiguous language that St. Paul agreed to provide full coverage for the F & G ESOP from the inception of the Policy while she attempted to find the correct way to accomplish the technical correction of the Policy document. This constitutes an enforceable voluntary reformation despite the fact that St. Paul apparently changed its mind and prevented her from completing the formal steps to make the Policy formally reflect the agreed to reformation once it learned that the *Keach* suit had been filed. In fact, the underwriter testified in her deposition that based on the facts in the file,

she would have reached the same conclusion that the original intent of St. Paul, Aon, and F & G was to provide for the coverage for the ESOP even if she had known that litigation was looming or that a claim had been made. St. Paul cannot now attempt to avoid the voluntary reformation simply because the reformed Policy exposes it to potential liability.

As the Court has concluded that there was a voluntary reformation of the Policy by the parties that is enforceable against St. Paul, there is no need to address the alternative request for judicial reformation of the Policy. St. Paul's motion is therefore denied as it pertains to coverage under the policy, and the corresponding motions by the various Defendants are granted in part and moot in part.

## II. *Insurable "Loss"*

■ St. Paul contends that it is entitled to summary judgment because there has been no covered "loss" under the terms of the policy. Relying on the Seventh Circuit's opinion in *Level 3 Communications v. Fed. Ins. Co.*, 272 F.3d 908 (7th Cir. 2001), this argument is based on the theory that the relief sought in the *Keach* case, namely restitution, is uninsurable as a matter of public policy. The Court agrees as a matter of principle that restitutionary relief, that is relief intended to divest the insured of the net benefit of an unlawful act or "the restoration of an ill-gotten gain", is uninsurable because such protection would "insure a thief against the cost to him of disgorging the proceeds of the theft." *Id.* at 910. As such, some of the damages alleged in the *Keach* case (such as the claim for restitution asserted in Count IX) are plainly uninsurable. However, the Court cannot find as a matter of law that all potential relief sought in that case is restitutionary in nature.

■ Depending on the facts ascertained at trial in the underlying litigation, different measures of damages may theoretically be available. For example, one type of damages asserted by the Plaintiffs in the *Keach* case is damages for the loss of the value of F & G stocks owned by the ESOP prior to the purportedly illegal stock purchase transactions. If Defendants are held to compensate the ESOP for the value of other stock owned, which allegedly lost its value as a result of a catastrophic chain of events that was purportedly set in motion by the debt incurred via the stock purchase transactions, that amount cannot reasonably be construed as relief divesting an insured of the net benefit of his unlawful actions, an amount that the insured had gained from it's officers' misbehavior, or the restoration of an ill-gotten gain. *See Level 3*, 272 F.3d at 911. The *Keach* plaintiffs also seek relief from Defendants Cole, Dix, and Elletson, none of whom sold stock in the stock purchase transactions and therefore have no ill-gotten gain to restore. There is also the question of liability for defense costs in the event that Defendants prevail in the underlying litigation. As more than one type of non-restitutionary relief remains a theoretical possibility in the *Keach* case, St. Paul is not entitled to a finding as a matter of law that there is no insurable loss within the meaning of the Policy with respect to the fiduciary claims. St. Paul's Motion for Summary Judgment in this respect is therefore granted as to the claims seeking purely restitutionary relief (such as the claims in Count IX) and denied as to the remainder of the claims. The corresponding motions by Defendants are also denied.

### III. *Personal Profits Exclusion*

■ The Policy provides in relevant part:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured Person, or with respect to Insuring Agreement C, the Company ... based upon, arising out of or attributable to any Insured gaining in fact any personal profit, remuneration or financial advantage to which such Insured was not legally entitled....

St. Paul contends that since the *Keach* case makes allegations based upon the insureds gaining personal profit to which they were not entitled, the personal profit exclusion bars coverage to all Defendants. Under St. Paul's theory, a final adjudication of wrongdoing is not required; mere allegations that any insured gained a personal profit to which he was not legally entitled would be enough to void coverage for all Defendants.

■ With all due respect, St. Paul's position is untenable and ignores the nature of the claims asserted in the *Keach* case. The very language of the exclusion is premised upon an "Insured gaining *in fact* any personal profit ... to which such Insured was not legally entitled ..." (Emphasis added). St. Paul's interpretation renders the "in fact" language superfluous, which is contrary to the principles of construction directing courts to give meaning to all policy provisions and avoid interpretations that render any part of the contract superfluous. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1219 (Ill.1992); *Citizens First National Bank of Princeton v. Cincinnati Insurance Co.*, 200 F.3d 1102, 1109 (7th Cir.2000). As the selling shareholders in this case could receive personal profits and be legally entitled to retain them so long as adequate consideration was given in return, and that issue remains to be determined at trial in the underlying litigation, it is clear that any determination as to whether an insured in this case gained personal profit in fact must await resolution of the underlying litigation.

In this respect, this case is fundamentally distinguishable from the situation in *Brown & LaCounte, LLP v. Westport Insurance Corporation*, 307 F.3d 660, 663–64 (7th Cir.2002), where the allegations involved an attorney having billed and received payment for legal services provided without a federally-approved attorney contract. Rather, the allegations in this case are more like the cases distinguished in *Brown & LaCounte*, which involved allegations of breached fiduciary duty where the dispute concerned the illegality of the actions taken or profits received, namely *Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 197 F.3d 742 (5th Cir.1999); *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F.Supp.2d 376 (D.Del.2002); *Aetna Cas. & Sur. Co. v. Clasby*, 788 F.Supp. 61 (D.Mass.1991); *Gardner v. Cumis Ins. Soc'y, Inc.*, 582 So.2d 1094 (Ala. 1991); *Int'l Ins. Co. v. Johns*, 685 F.Supp. 1230 (S.D.Fla.1988); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Cont'l Ill. Corp.*, 666 F.Supp. 1180 (N.D.Ill.1987). In those cases, the courts focused on "whether there was sufficient evidence in the underlying complaint to show the profits received were illegal or undeserved within the meaning of the exclusion." *Brown & LaCounte*, 307 F.3d at 664. In fact, in the *Clasby* case, which is the most factually analogous to the case now before the Court, the district court expressly noted in granting summary judgment that no exceptions to ERISA's prohibited transaction rule even potentially applied; such is not the case here.

As such a finding is inextricably intertwined with a genuine issue of material fact requiring resolution at trial in the underlying case, the Court cannot make resolve this question on summary judgment prior to the resolution of the underlying litigation. Accordingly, all motions seeking summary judgment on the applicability of the personal profits exclusion are premature and are therefore denied.

IV. *Adequacy of Notice*

St. Paul argues that the insureds breached their duty to give it notice of the *Keach* claims as soon as practicable, thus invalidating all coverage for all Defendants. Specifically, St. Paul asserts that Attorney Rhoads' letter in January 2001 constituted a claim against the policy which required the insureds to notify St. Paul despite the fact that the Complaint in *Keach* was not filed until April 6, 2001. As F & G did not notify St. Paul of the *Keach* suit until April 16, 2001, St. Paul contends that notice was untimely.

██ Upon receipt of a "claim," F & G had a contractual duty under the Policy to provide notice to St. Paul "as soon as practicable." A "claim" is further defined as:

1. a written demand against any Insured for monetary damages or other relief; 2. a civil proceeding against any Insured commenced by the service of a complaint or similar pleading; 3. a criminal proceeding against any Insured commenced by a return of an indictment; or 4. a formal civil administrative or regulatory proceeding against any Insured commenced by the filing of a notice of charges, formal investigative order or similar document; for a Wrongful Act, including any appeal therefrom.

The Seventh Circuit has acknowledged that the purpose of notice provisions such as this is "to ensure that the insurer will not be prejudiced in its ability to investigate and defend claims against its insureds." *Commercial Underwriters Insurance Co. v. Aires Environmental Services, Ltd.*, 259 F.3d 792, 796 (7th Cir. 2001). Accordingly, the failure to fulfill a contractual requirement of timely notice can relieve the insurer of its duty to defend or indemnify the insureds. *Id.*

In this circuit, a determination of whether notice in a particular case was timely is

a fact intensive inquiry. *Id.* Prejudice to the insurer as a result of the delay is one factor to be considered, but "an insurer need not prove that it was prejudiced in order to deny coverage." *Id.* On the other hand, "a lengthy passage of time is not an absolute bar to coverage provided that the insured has a justifiable excuse for the delay." *Id.*

Rhoads' January 30, 2001, letters to Terry Cole and Robert Ostertag are virtually identical except for the addressee. Each letter asks the recipient to "[p]lease furnish a copy of the latest updated summary plan description, and the latest annual report, the plan document, the trust agreement, contract, or other instruments under which the ESOP is established or operated." The letters then go on to summarize the decline in value of F & G shares since the stock purchase transactions before asserting a need for "material information, facts and documentation" so that his clients could "adequately protect their interests". Rhoads questions whether the recipient has conducted any review or investigation to determine what recourse, if any, the ESOP may have against any of the parties or advisors involved in the stock purchase transactions, and finishes by asking if the recipient has any knowledge of a breach of fiduciary responsibility by any fiduciary to the ESOP.

■■■ It is undisputed that Rhoads' letter does not contain any demand for monetary damages. However, St. Paul argues that the request for information constitutes "other relief" within the meaning of a "claim" under the terms of the Policy. In support of its position that a third-party demand for production of documents constitutes a claim, St. Paul cites *Richardson Electronics, Ltd. v. Federal Ins. Co.*, 120 F.Supp.2d 698 (N.D.Ill.2000). However, with all due respect, the third-party demanding documents in that case was the Department of Justice serving a Civil In-vestigative Demand and subpoena, and the seriousness of such an investigation was clearly material to the district court's determination, as it was on that basis that the district court distinguished the Seventh Circuit's opinion in *Trice v. Employers Reinsurance Corp.*, 1997 WL 449736 (7th Cir. July 28, 1997). *Id.* at 700–01. In *Trice,* the Seventh Circuit found that "[A]n actual claim is distinguished from an 'event' which could give rise to an actual claim in the future.... Requests for information—even if they allude specifically to the possibility of a lawsuit—do not constitute a 'demand for money or services' within the meaning of a claims-made policy." *Id.* at *3, *citing Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 143 (7th Cir. 1994); *National Fire Ins. Co. v. Bartolazo*, 27 F.3d 518, 519 (11th Cir.1994). Although a formal lawsuit is not required to present "a demand for money or services," the inquiry must present more than a mere request for information. *Id.*

Here, Rhoads' letter was a request for information and copies of documents regarding the ESOP and stock purchase transactions. Under St. Paul's interpretation of its policy language, any request by a beneficiary for any information pursuant to ERISA would constitute a claim. There is no legal support for such a sweeping construction, and this Court disagrees.

The standard urged by St. Paul would be bad public policy. It would create uncertainty in every policy containing this notice requirement, as well as result in a flood of notices of "claims" based on requests for information or efforts at intimidation by attorneys that may never materialize into demands against any insurance policies. *See Hoyt v. St. Paul Fire and Marine Insurance Co.*, 607 F.2d 864, 866 (9th Cir.1979) (finding that "an inquiry cannot be transformed into a claim or de-

mand depending in each case on the reasonable expectations of the insured whether he should reasonably have been satisfied that the explanation would be accepted as justification for the questioned conduct or should reasonably have expected that it would not.") The fact that this particular inquiry purports to request information pursuant to ERISA does not transform an otherwise ordinary request for information into the substantive equivalent of a Department of Justice subpoena or Civil Investigative Demand.

Moreover, if St. Paul intended to invoke such a stringent reporting requirement, then it should have done so expressly rather than using the ambiguous language "a written demand . . . for monetary damages or other relief," which suggests a legal remedy or at least that a claim is something more than a request for information dressed in legalese. For example, St. Paul could have drafted language defining a claim as "a written demand . . . for monetary damages or other relief, including a request for information that may ultimately result in a claim." St. Paul could also have expressly defined "other relief" to include a request for information. However, St. Paul chose not to do so, and ambiguity must be construed against the insurer and in favor of coverage. *See Citizens,* 200 F.3d at 1108–09.

Accordingly, St. Paul's assertion that Rhoads' January 30, 2001, letters constituted claims under the terms of the Policy is rejected as a matter of law. The *Keach* suit was filed on April 6, 2001, and F & G provided notice to St. Paul on April 16, 2001. The Court cannot find as a matter of law that notice given within no more than ten calendar days was not "as soon as practicable." St. Paul's Motion for Summary Judgment is therefore denied in this respect, and the corresponding portions of Defendants' Motions for Summary Judgment are granted.

## V. *Party–in–Interest Coverage*

St. Paul next asserts that even assuming that the Policy does provide some coverage for the ESOP, it covers only a breach of an ERISA fiduciary's duties, and therefore, does not provide coverage to the Defendants sued for restitution as "parties in interest" in Count IX of the Complaint in the *Keach* case. This question is effectively mooted by the Court's ruling that restitutionary relief does not constitute a "loss" under the policy, because Count IX seeks relief that is purely restitutionary in nature. Accordingly, there is no need to provide an advisory opinion as to whether or not non-fiduciaries could potentially be covered under the Policy's fiduciaries' liability supplement.

## VI. *Known Loss Doctrine*

St. Paul argues that the known loss doctrine prohibits the retroactive reformation of the Policy because F & G began to negotiate for coverage after receiving the letter from Attorney Rhoads putting them on notice of the potential for litigation arising out of the ESOP transactions. The so-called known loss doctrine recognizes that insurance is by its very nature based on contingent risks. *Outboard Marine Corp., v. Liberty Mutual Ins. Co.,* 154 Ill.2d 90, 607 N.E.2d 1204, 1210 (1993). Where an insured either knows or has reason to know that there is a substantial probability that it will suffer or has already suffered a loss at the time it purchases the policy, the loss is no longer contingent, but rather is probable or known. *Id.* Thus, under this doctrine, a known loss is uninsurable "[w]here the insured has evidence of a probable loss when it purchases a . . . policy" and "the insurer has no duty to defend or indemnify the insured with respect to the known loss *ab initio,* unless the parties intended the known loss to be covered." *Id.* The extent

and timing of an insured's knowledge must be determined on a case-by-case basis. *Id.*

Here, unlike the situation in *Outboard Marine,* St. Paul's own agents determined that coverage for the ESOP was part of the initial bargain and should have been included in the Policy from its inception. In fact, it was so clearly indicated to them through their review of the file that they undertook a voluntary reformation of the Policy to retroactively conform to the originally intended coverage. As such, F & G could not have had notice of a substantial probability that it would suffer a loss as a result of any claim or inquiry first made on behalf of the *Keach* plaintiffs in 2001 when it purchased the coverage in March 2000. Accordingly, Defendants' motions are granted in relevant part, and St. Paul's motion is denied in this respect.

## VII. *Duty of Good Faith and Fair Dealing*

St. Paul asserts that F & G breached its duty of good faith and fair dealing by failing to disclose the ESOP claim while it was negotiating for ESOP coverage. However, again by the admissions of St. Paul's own agents, Conley and Nelson, the interactions between Jacobs and Conley in early 2001 were efforts to voluntarily reform the contract to correct a mutual mistake rather than an effort to modify the Policy to obtain coverage that was not bargained for in the initial agreement. The Court has also rejected the effort by St. Paul to construe Attorney Rhoads' January 30, 2001, letter as a claim against the Policy. Accordingly, F & G did not breach its duty of good faith and fair dealing by failing to disclose a claim against the Policy while it was negotiating for additional coverage, and St. Paul's motion is therefore denied.

## VIII. *Vexatious Denial of Coverage/Willful and Wanton Conduct*

■ Various Defendants have filed counterclaims alleging that St. Paul's conduct in denying them coverage and a defense under the policy, as well as in bringing this litigation, constitutes a vexatious denial of coverage or willful and wanton conduct. St. Paul argues that such claims should be dismissed on the grounds that its conduct was not vexatious, wanton, or unreasonable.

Section 155 of the Illinois Insurance Code provides that an award of attorneys fees and other costs is appropriate if insurers' actions are "vexatious and unreasonable." 215 ILCS 5/155 (West 1999). Under this statute, an insurer must do more than take a position that is ultimately unsuccessful; rather, the evidence must show that the insurer's behavior was "willful and without reasonable cause." *Citizens,* 200 F.3d at 1110. Accordingly, an insurer's conduct is not vexatious if:

(1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.

*Id.* (internal citations omitted).

Here, although the Court has determined that coverage was at least potentially available for the ESOP under the Policy, several of St. Paul's conduct-based exclusions have not been resolved and await determination following the trial of the underlying litigation. The same result necessarily follows for the claim by the Cole Defendants that St. Paul acted in a willful and wanton manner. Thus, summary judgment is not appropriate at this stage of the litigation.

## IX. *Misrepresentations in Application*

 St. Paul seeks a judicial declaration that it has a right to rescind the Policy based on purported material misrepresentations by F & G in its application for coverage. Defendants have moved for summary judgment on this claim on grounds of waiver and/or estoppel. Initially, the Court notes that Defendants' suggestion that St. Paul waived this defense by failing to assert it in its reservation of rights letter or declination letters must be rejected. St. Paul's September 12, 2001, and October 2, 2001, letters clearly assert a right to avoid the contract to the extent that information in F & G's application that was relied on in making its underwriting decisions was materially incorrect.

As the Court has held previously in both this case and the underlying litigation, there are plainly disputes of material fact requiring assessments of credibility as to what was known or should have been known by individuals at F & G during the relevant period. As these disputes form the basis for several of the alleged misrepresentations, this issue is inappropriate for resolution on summary judgment, and Defendants' motions are therefore denied.

## X. *Aon's Motion for Summary Judgment*

 Aon moves for summary judgment on the Third Party Complaint. Although Aon makes several arguments as to why the Policy provides or should be reformed to provide coverage for the ESOP, the Court need only address the argument that essentially adopts the voluntary reformation argument of the Defendants discussed previously in this Order, and the remaining arguments are effectively moot. To the extent that Aon argues that the conduct of Conley and Nelson resulted in a voluntary reformation that should be enforced against St. Paul, Aon's Motion for Summary Judgment shall be granted.

Aon contends that because it was terminated as F & G's broker effective December 5, 2000, and the only dated form of the FPMS93 endorsement specifically excluding coverage for the ESOP was dated December 19, 2000, *no action can lie against it.* However, this assertion ignores the existence of a genuine issue of material fact with respect to when the FPMS93 endorsement first appeared in the Policy. As there is evidence in the record from which a trier of fact could conclude that the endorsement was present (although in an undated form) when received by Aon in October 2000, Aon is not entitled to summary judgment on this basis.

Aon next suggests that to the extent that a policy exclusion independently bars coverage for the claims alleged in *Keach,* it cannot be liable to Defendants. Specifically, Aon adopts St. Paul's argument that there was no covered "loss" under the policy, that the personal profits exclusion applies, that the known loss doctrine would bar coverage, that F & G failed to give adequate notice of a claim, and that F & G breached its duty of good faith and fair dealing. To that extent, Aon's motion is denied for the same reasons as discussed in Sections II, III, IV, VI, and VII of this Order.

Although Aon correctly asserts that it is not a guarantor of coverage, the fact that the Court has found in favor of Defendants and Aon on the question of whether the Policy provided coverage for the ESOP does not end Aon's involvement in this case. The Defendants have also alleged other breaches of fiduciary duty and/or negligence against Aon regarding damages flowing directly from its failure to follow up on or communicate the identified deficiencies in the original policy that issued from St. Paul that are not resolved by the present motion.

## CONCLUSION

For the reasons set forth above, St. Paul's Motion for Summary Judgment [# 167] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. The Motion for Summary Judgment by Northern Trust and Ellen Foster as the Co Trustees of the Thomas Foster Trust [# 191] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. Aon's Motion for Summary Judgment [# 193] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. The Motion for Summary Judgment by the Cole Defendants [# 224] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART, and the Motion for Summary Judgment by Ellen Foster as the Executrix, et al., [# 195] is GRANTED IN PART, DENIED IN PART, and MOOT IN PART.

This matter is now ready for final pretrial conference. However, as a result of the rulings contained in this Order, it is apparent that the remaining issues are dependant upon factual disputes that must be resolved through the underlying *Keach* litigation. As the parties indicated during the telephonic oral argument, given the posture of this case, no real purpose would be served by holding the final pretrial conference as currently scheduled. Accordingly, the final pretrial conference set for July 11, 2003, at 1:00 p.m., and the trial set to begin on September 8, 2003, are hereby VACATED, and will be reset upon the resolution of the underlying litigation.